IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| ERGUN M. CANER,<br><br>                                          *Plaintiff,*<br><br>                    v.<br><br>JONATHAN AUTRY,<br><br>                                          *Defendant.* | CASE NO. 6:14-cv-00004<br><br>**MEMORANDUM OPINION**<br><br>JUDGE NORMAN K. MOON |

This case is before the Court on Defendant Jonathan Autry's Motion to Dismiss the Amended Complaint for Failure to State a Claim, or in the Alternative, for Summary Judgment ("Motion") (docket no. 28), filed on November 26, 2013. Ergun M. Caner ("Plaintiff" or "Caner") originally filed this action in the Northern District of Texas, claiming that Jonathan Autry ("Defendant" or "Autry") and another person, Jason Smathers, infringed his copyrights by posting various videos on YouTube.com and other websites. Plaintiff filed his Amended Complaint (docket no. 13) on October 14, 2013, in the Northern District of Texas. Plaintiff seeks a permanent injunction restraining Defendant from any further infringement, along with costs, attorney's fees, investigatory fees, and expenses available under 17 U.S.C. § 505 (the "Copyright Act"). Am. Compl. ¶¶ 48–50.

Ergun M. Caner was born to parents who met at a university in Sweden, and he lived with them and his brothers in Ohio from the time he was a toddler.[1] His father was a devout Muslim, highly involved in the Islamic Community in Ohio, and after a painful divorce, Plaintiff spent weekend visitation at the mosque in Columbus, Ohio with his father. Sometime during

---

[1] For clarity, I provide a brief synopsis of the facts surrounding this case here. In the Background Section and throughout this opinion, I specify the source and admissibility for each piece of this information.

high school, Plaintiff began attending church with a friend and became a born-again Christian, going on to obtain a Master of Theology from Southeastern Baptist Theological Seminary in Wake Forest, North Carolina, and a Doctor of Theology from the University of South Africa. About a year after the terrorist attacks on September 11, 2001, Plaintiff and his brother, Emir Caner, wrote what became a popular book about their upbringing as Muslims in Ohio and  their conversion to Christianity.  Plaintiff became a spokesperson for this background, and was hired by Jerry Fallwell in 2005 to serve as the dean of the Liberty Theological Seminary.

Around this time, Plaintiff started making claims in his public speeches that he had grown up as a Muslim in Turkey, steeped and trained in jihad, in a tradition that went back several generations in his father's family.  After bloggers and major news media outlets began reporting on contradictions in Plaintiff's narrative, Liberty University conducted an official inquiry into these accusations in May 2010.  Shortly thereafter, Liberty demoted Plaintiff from his position as dean, citing contradictions in factual statements he had made.  By 2011, Plaintiff announced that he was called to serve as provost and vice president of academic affairs at Arlington Baptist College in North Texas.

Defendant attended Liberty Theological Seminary during the time Plaintiff served as dean, and as Plaintiff concedes, initially supported Plaintiff and his message.  Eventually, revelations led Defendant to believe that Plaintiff was a detriment to the Christian religion and their common institution, Liberty University.  Although accusations against Plaintiff emerged in 2010, it was not until the spring of 2011 and the spring of 2012 that Defendant joined the criticism by posting the Count Two and Count One Videos, respectively.  Mot., Ex. A ¶¶ 8, 18. In February 2012, Defendant posted the Count One Video, in which Plaintiff proclaimed his Muslim upbringing in Turkey and expounded on how Muslims in the Middle East would view

2

the U.S. Marines and approach them from the perspective of jihad.  Mot., Ex. A ¶¶ 9, 18, 20–23.

Defendant wished to expose Plaintiff's dishonesty, knowing he was making claims like those in

the Count One Video to countless churches and before the U.S. Military.  Mot., Ex. A ¶¶ 21–23.

      Plaintiff responded to Defendant's videos by claiming he possessed copyright protection

over the Count One and Two Videos, filing a takedown notice with YouTube.com in May 2013.

Am. Compl. ¶ 9.  Defendant contested the videos' removal, and on June 4, 2013, YouTube.com

informed Plaintiff that it would repost the videos unless Plaintiff filed legal action within ten

business days.  Am. Compl. ¶ 12.  This suit followed in the Northern District of Texas, on June

18, 2013.

      In the Northern District of Texas, the parties filed various motions related to this case,

including Defendant's Motion.  Plaintiff responded to the Motion on January 6, 2014. On

January 15, 2014, the Northern District of Texas severed Jonathan Autry from the case and

transferred it to this Court, where only two videos mentioned in the Amended Complaint remain

at issue.

      Upon arrival in this Court and after various motions by Defendant, Magistrate Judge

Robert S. Ballou ordered the parties to hold a scheduling conference, exchange initial

disclosures, and exchange written discovery while the Motion was pending, but allowed

Defendant to stay further discovery until the Motion's disposition.  *See* April 11, 2014 Order

(docket no. 56).  On April 4, 2014, Defendant filed his reply on the Motion.  On April 17, 2014,

Defendant filed notice with this Court that the Northern District of Texas granted an identical

motion to dismiss as to Jason Smathers, the other original defendant.  On April 28, 2014,

Defendant filed an unopposed Motion to Supplement the Record (docket no. 58) with copies of

the copyright applications Plaintiff had filed with the Copyright Office, which this Court granted.

*See* April 29, 2014 Order (docket no. 59).  A telephonic hearing on the Motion was held at 2:00 p.m. on April 30, 2014.  After the hearing, Defendant filed a Second Motion to Supplement the Record (docket no. 63) with information contesting Plaintiff's assertion during the hearing that Defendant was a disgruntled former employee.

For the reasons that follow, I will CONSIDER the Motion as one for summary judgment and GRANT that Motion (docket no. 28).  I will DENY the Second Motion to Supplement the Record (docket no. 63).

## II. BACKGROUND[2]

Plaintiff resides in Texas and alleged he was employed at Arlington Baptist College in Arlington, Texas.[3]  The Amended Complaint alleges that Defendant resided in Lynchburg, Virginia.[4]  This Amended Complaint makes claims under the Copyright Act, 17 U.S.C. §§ 101,

---

[2] Plaintiff's response to the Motion is very brief, essentially contesting only whether he "paid the Copyright Registration fees, deposited the transcripts with the Copyright Office, and has received receipts of the payment and deposit from the United States Copyright Office."  Resp. at 1.  This Court has gathered background from the Amended Complaint, sources from which it can take judicial notice, and from the record before it on this converted motion for summary judgment, as noted for each source outside the Amended Complaint throughout.

[3] Although Plaintiff does not specify his place of employment, the address he lists for his place of employment corresponds to the one Arlington Baptist College lists on its website, of which this Court may *sua sponte* take judicial notice.  *See Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227–28 (4th Cir. 2013) (approving a district court's broad discretion to consider a university's continuous enrollment requirement from its website on a motion to dismiss); Fed. R. Ev. 201(c)(1), (d) (allowing a district court to take judicial notice of facts).  *Compare* Am. Compl. ("Dr. Caner's place of employment is located at 3001 West Division Street, Arlington, TX 76012."), *with* ArlingtonBaptistCollege.edu, Arlington Baptist College Location and Address, http://www.arlingtonbaptistcollege.edu/contact/arlington-baptist-college-location-and-address (listing address as 3001 W Division St) (last visited Apr. 25, 2014).  However, I take judicial notice under Rule 201(b)(2) and *Jeandron* that Plaintiff has since been hired as President of Brewton-Parker College in Decatur, Georgia, which describes itself as a "Georgia Baptist College" and announced Dr. Caner's selection on its website.  *See Brewton-Parker College Calls Caner as President: Controversial Educator Determined to Raise the College's Profile*, bpc.edu, BPC News, http://www.bpc.edu/news_and_info/news/2013/December/12-3_Brewton_Parker_College_Calls_Caner_as_President.htm (last viewed May 14, 2014).

[4] Jonathan Autry's Declaration, attached to the Motion, states that since the filing of the Amended Complaint, he has moved to the Eastern District of Virginia.  Mot., Ex. A ¶ 3.  Despite Defendant's move, I find proper venue in this district, as it is the one "in which a substantial part of the events or omissions giving rise to the claim occurred," and since the two parties do not live in the same state.  *See* 28 U.S.C. § 1391(b)(2).

501.  Plaintiff became a prominent leader in the evangelical Christian community[5] sometime

after the September 11, 2001 terrorist attacks, when he spoke and wrote to numerous audiences

throughout the United States about his upbringing as a Muslim in either Turkey or Ohio,[6] and his

---

[5] Plaintiff's counsel repeatedly conceded that Plaintiff serves as a visible, public figure within the evangelical Christian community during the hearing on this Motion.  During the hearing, he noted that Plaintiff "is a college pres[ident]," that he "has written a number of books," and that he "is someone that is out in the public square." Hearing Tr. at 10, Apr. 30, 2014 (docket no. 64).  He later compared Plaintiff to "authors, public speakers, [and] educational leaders," and noted Plaintiff acts as a "spokesperson and as an academ[ician]."  *Id.* at 10, 28.  Indeed, the United States Marines wanted to hear him speak such that Plaintiff "donated the event . . . almost like a pro bono or a charity event for the Military" when he made his presentation, and suggested Plaintiff was donated his travel expenses.  *Id.* at 11, 14.  These statements are admissible as opposing party's statements, made by Plaintiff's attorney in a representative capacity.  *See* Fed. R. Ev. 801(d)(2).  Furthermore, as noted in footnote 7, this Court takes judicial notice of Plaintiff's status as a public figure from the newspaper sources cited in footnote 11, for the reasons noted therein.  I note I do not use these newspaper sources for the truth of the matters asserted, only to show Plaintiff has been a frequent subject of local and national media coverage as a public figure.  *See* Fed. R. Ev. 801(c).

Information about Plaintiff's degrees comes directly from his website, and I take notice of it as an indisputable fact under Federal Rule of Evidence 201(b)(2).  *See also O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224–25 (10th Cir. 2007) (noting company's failure to dispute the earnings history it listed on its own website made that information capable of judicial notice and indisputable under Rule 201(b)).  *See also* bio, erguncaner.com, http://www.erguncaner.com/biography/ (last viewed May 13, 2014).

[6] *Compare* Ergun Mehmet Caner & Emir Fethi Caner, *Unveiling Islam: An Insider's Look at Muslim Life and Beliefs* 17–19 (2002) [hereinafter "*Unveiling Islam*"] (noting Plaintiff's father and mother met at a university in Sweden, where Ergun was born, then moved "to America," where "Emir was born after we arrived in Ohio," and discussing how Ergun attended a mosque on Broad Street in Columbus, Ohio as a teenager during weekend visits to his father after his parents' divorce, until he converted to Christianity at a friend's urging in high school) *with* First Supplement to Record, Copyright Application for "Training Session: What You Need to know About Islam—Base Theater" at 2–4, 10 [hereinafter "Base Theater Application"] (noting Plaintiff "wore [his] robes" to America, that there are "two types of Turks who come to America," that "[w]e came in full gear," that he was "taught that you hated me" through his "training and [his] Madrasa Istanbul, and his "training and my Madrasa in Cairo before [coming] to America," describing himself as a "Turk," and saying he did not encounter the two nations of Islam "until '78 when we came here to America") *and Dr. Emir Caner*, Truett-McConnell College, http://www.truett.edu/abouttmc/meet-dr-caner.html (noting Dr. Emir Caner was "[b]orn on August 25, 1970 . . . ."); First Supplement to Record, Copyright Application for "Training Session: What You Need to know About Islam— O-Club" at 2, 5 [hereinafter "O-Club Application"] (stating "I'm Turkish," that he "knew nothing about American until [he] came here when [he] was 14 years old. Everything [he] knew about American culture [he] learned through American television, whatever they allowed into the Turkish region," that he "moved to Brooklyn, New York," that he was "sworn to Jihad. At the age of 9 until I was 18 years old and [he] became a believer in Jesus Christ").

I take judicial notice of Plaintiff's own narratives of his upbringing from the copyright applications he told this Court he submitted to the Copyright Office, and from his book, *Unveiling Islam*.  These sources provide "indisputable" evidence of which this Court may take notice under Rule 201(b)(2) on summary judgment.  *See* Fed. R. Ev. 201(b)(2); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224–25 (10th Cir. 2007) (noting company's failure to dispute the earnings history it listed on its own website made that information capable of judicial notice and indisputable under Rule 201(b)).  Evidence from these sources is also admissible under Federal Rule of Evidence 801(d)(2) as an opposing party's statements, or alternatively under Rule 801(c) as not for the truth of where Plaintiff was raised, but to show the content of his speeches and writings.  Fed. R. Ev. 801(c); 801(d)(2).  I take notice of Dr. Emir Caner's biographical details from the Truett-McConnell College website.  *See, e.g.*, *Jeandron*, 510 F. App'x at 227–28; Fed. R. Ev. 201(b)(2), (c)(1), (d).

conversion to Christianity as a teenager.[7]  Plaintiff became dean of the theological seminary at

Liberty University in 2005, and served in that post until 2010.[8]  Controversy emerged in 2010

when public questions were raised regarding some details of Plaintiff's background.  While he

claimed to have been raised as a devout Muslim and jihadist in Turkey until his teenage years,[9]

various bloggers and newspapers began to point out that other speeches and a book Plaintiff

---

[7] Again, Plaintiff's attorney has conceded Plaintiff serves as a "college president," author who has "written a number of books," "someone in the public square," "spokesperson and . . . academician."  Hearing Tr. at 10, 11, 14, 28, Apr. 30, 2014 (docket no. 64).  This Court may take judicial notice under Federal Rule of Evidence 201(b) of facts "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined by sources whose accuracy cannot reasonably be questioned."  Fed. R. Ev. 201(b)(2).  This Court takes judicial notice of the claims made by Plaintiff about his background in his own book, *Unveiling Islam*, where he and his brother narrate their upbringing as Muslims and their understanding of jihad.  *Unveiling Islam*, *supra* note 5, at 13–20, 26 (narrating their daily life as Muslims, Plaintiff's conversion to Christianity, and Plaintiff and his brother's explanations of Islam ever since).  This is indisputable information under Rule 201(b)(2); *see also O'Toole*, 499 F.3d at 1224–25.  Courts frequently take notice of adjudicative facts from newspapers, and I do so here, not for the truth of the details asserted in the newspapers, but for Plaintiff's general self-promoted reputation as a person with an Islamic upbringing who later converted to Christianity.  *See infra* note 11.  Fed. R. Civ. P. 201(b);  *see, e.g.*, *Crowder v. Kitagawa*, 81 F.3d 1480, 1491–92 (9th Cir. 1996) (taking judicial notice of fact that plaintiff guide-dog users claiming discrimination based on blindness constituted only 1–5% of the blind population); *Peters v. Delaware River Port Auth. of Pennsylvania & New Jersey*, 16 F.3d 1346, 1356 (3d Cir. 1994) (taking judicial notice of newspaper accounts that two state entities were in competition with one another at times); *Associated Gen. Contractors of Am. v. City of Columbus*, 936 F. Supp. 1363, 1425 (S.D. Ohio 1996) *vacated on other grounds*, 172 F.3d 411 (6th Cir. 1999) (collecting cases for proposition that a "court may take judicial notice of newspaper articles which demonstrate that certain facts were generally known within the court's jurisdiction").

[8] This Court may take judicial notice under Federal Rule of Evidence 201(b)(1) and (b)(2) of facts "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined by sources whose accuracy cannot reasonably be questioned."  Fed. R. Ev. 201(b).  Liberty University's website lists Dr. Caner as "President of Liberty Baptist Theological Seminary ["LBTS"] and Graduate School" multiple times, and states that he was dean of LBTS from 2005–2010.  *See, e.g.*, *Affiliated Schools and Companies*, liberty.edu, http://www.liberty.edu/media/1410/archive_finding_aids/AFS%20RG-02.pdf (last viewed April 28, 2014); *Evangelical Manifesto Erroneously Lists Prominent Evangelical Leaders as Signatories*, News Articles, liberty.edu (May 16, 2008), http://www.liberty.edu/law/index.cfm?PID=18456&artid=6969 (last viewed on April 28, 2014); *Dr. Caner guest on national call-in radio show*, News & Events, liberty.edu (March 3, 2008) http://www.liberty.edu/index.cfm?PID=18495&MID=6218 (last viewed April 28, 2014).

[9] *See* First Supplement to Record, Copyright Application for O-Club at 2, 5 (noting "I'm Turkish," that he "knew nothing about America until [he] came here when [he] was 14 years old. Everything [he] knew about American culture I learned through American television, whatever they allowed into the Turkish region," that he "moved to Brooklyn, New York," that he was "sworn to Jihad . . . [a]t the age of 9 until I was 18 years old and I became a believer in Jesus Christ").  I take judicial notice of these statements under Rule 201(b), and they are admissible under Rule 201(b) and either Rule 801(d)(2) or 801(c).  Fed. R. Ev. 201(b)(2); Fed. R. Ev. 801(c), 801(d)(2); *see also O'Toole v. Northrop Grumman Corp.*, 499 F.3d at 1224–25.

published with his brother[10] claimed he moved to the United States from Sweden when he was

three or four years old.[11]  In May 2010, citing "several newspapers rais[ing] questions," Liberty

University "form[ed] a committee to investigate a series of accusations against" Plaintiff, then

removed Plaintiff from his position as dean in July 2010; by 2011, Arlington Baptist College in

North Texas selected Plaintiff to serve as provost and vice president of academic affairs at

Arlington Baptist College in North Texas.[12]

Count One of the Amended Complaint claims Defendant posted a video on YouTube

("Count One Video") of a "presentation [Plaintiff made] as part of a training series on the

religion of Islam" to the United States Marines, for which Plaintiff was "compensated as an

---

[10] *Unveiling Islam*, *supra* note 5, at 17 (noting Plaintiff's father and mother met at university in Sweden, where Ergun was born, then moved "to America," where "Emir was born after we arrived in Ohio," and discussing how Ergun attended a mosque on Broad Street in Columbus, Ohio as a teenager); Fed. R. Ev. 201(b)(2); Fed. R. Ev. 801(c), 801(d)(2); *see also O'Toole*, 499 F.3d at 1224–25.

[11] I take judicial notice of these newspaper articles and blogs for facts that were generally known within the jurisdiction of this Court, *i.e.* the criticisms that surrounded Plaintiff beginning in 2010.  I do not consider the contents of these articles for their truth, but for the existence of criticisms made against Plaintiff in the media at that time. Fed. R. Ev. 201(b)(1); Fed. R. Ev. 801(c).  *See, e.g.*, William Wan & Michelle Boorstein, Washington Post, June 30, 2010, http://www.wp-dyn/content/article/2010/06/29/AR2010062905331.html (last viewed May 8, 2014) [hereinafter "*Liberty U. removing Ergun Caner*"] (noting Liberty University was removing Plaintiff as dean after bloggers pointed out contradictions between his sermons, where he claimed to have been raised as a jihadist in Turkey until coming to the United States as a teenager, while his book claimed he moved to Ohio from Sweden as a young child); David Neff, Christianity Today, June 6, 2010, http://www.christianitytoday.com/gleanings/2010/june/liberty-university-cuts-caner-as-seminary-dean.html?paging=off (last viewed May 8, 2014) (same); Ray Reed, *Caner Leaving Liberty for Texas College Post*, Lynchburg News & Advance, Updated Feb. 18, 2013, http://www.newsadvance.com/news/local/caner-leaving-liberty-for-texas-college-post/article_5e7298ad-7002-5f0b-88cd-b574f128826f.html?mode=jqm (last viewed May 8, 2014) (noting contradictions in Plaintiff's narrative, including that he "often described himself as an immigrant from Turkey," but that court documents indicated he was "born in Sweden and came to the United States with his family at about the age of 4").

[12] I take judicial notice of the investigation, removal, and move as facts generally known within this trial court's jurisdiction, as announced by reliable sources with circumstantial guarantees of trustworthiness and more probative on the point than any other evidence that can reasonably be obtained, and serving the purposes of the Rules of Evidence and interests of justice.  The investigation was announced by Liberty University on its website, the removal was reported in the Washington Post based on an official statement by Liberty University, and the move was reported in a press release on Plaintiff's own website.  Fed. R. Civ. P. 201(b); Fed. R. Ev. 807; *Jeandron*, 510 F. App'x at 227–28;  *O'Toole*, 499 F.3d at 1224–25; University Advancement staff, *Committee formed to investigate Caner statements*, News & Events, liberty.edu (May 10, 2010), http://www.liberty.edu/promotionalpublications/index.cfm?PID=18495&MID=18644 (last viewed April 28, 2014); *Liberty U. removing Ergun Caner*; Press Release, erguncaner.com, Ergun Caner Called as Provost and Vice President of Academic Affairs at Arlington Baptist College (May 17, 2011), http://www.erguncaner.com/2011/05/17/arlingtonbiblecollege/ (last viewed April 28, 2014).

independent contractor."  Am. Compl. ¶ 15.  Plaintiff claims Defendant thereby infringed on a copyright "to the content of his presentation," an application for which is "currently pending at the Copyright Office."  Am. Compl. ¶ 14.  On May 13, 2013, "Dr. Caner filed a takedown notice . . . with Youtube.com . . . challenging Defendant's use" of this video and others.  Am. Compl. ¶ 9.  Defendant then "challeng[ed] the removal of two of Dr. Caner's videos" and YouTube.com informed Plaintiff on June 4, 2013, that the "videos would be reposted to Autry's account if Dr. Caner did not initiate legal action within ten business days."  Am. Compl. ¶ 12.

Count Two of the Amended Complaint alleges Defendant infringed Plaintiff's rights with a second video, titled "Ergun Educated in Cairo, Egypt," ("Count Two Video") which "includes live portions of recorded footage of Dr. Caner during various presentations and sermons."  Am. Compl. ¶¶ 20–22.  Plaintiff alleges he "owns the copyright to the content of his presentation and has not authorized Autry to use any portion of this work."  Am. Compl. ¶ 22.

Plaintiff filed his initial complaint in the Northern District of Texas on June 18, 2013, and his Amended Complaint on October 14, 2013.  After filing various motions regarding jurisdiction, venue, and severance, Defendant responded to the Amended Complaint with this Motion on November 26, 2013.  Defendant attached several exhibits to the Motion, related to his reasons for posting the videos and to Jason Smathers' alleged Freedom of Information Act ("FOIA") request for the Count One Video.  Mot. to Dismiss, Exs. A–D.  Plaintiff's response to the Motion attached an exhibit showing emails from the "Copyright Office" confirming that he successfully uploaded a file entitled "Ergun Caner trains US Marines o_club.pdf," and that he applied and paid for applications for works entitled: "Training Session: What You Need to Know About Islam—Base Theater" and "Training Session: What You Need to Know About Islam—O-Club."  *See* Resp. on Mot. to Dismiss, Ex. A.  The attachments did not include confirmation that

Plaintiff successfully uploaded a file corresponding with the "Base Theater" training session file name, only two confirmations for files entitled "o_club." *Id.*

Defendant submitted several more exhibits to this Court through two motions to supplement the record. This Court granted leave for Defendant to supplement the record on the first motion, with "electronic cop[ies] of Dr. Caner's two application for copyrights," with "the transcript of Dr. Caner's respective sermons" attached to each application. Mot. to Supplement the Record ¶¶ 5–6 (docket no. 58). Defendant also submitted a second declaration by Jonathan Autry, describing the extent of his and his wife's employment for Liberty University, and for Plaintiff. Second Mot. to Supplement the Record, Ex. A (docket no. 63).[13]

### III. LEGAL STANDARD

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true, and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court is not required to "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (citations omitted).

---

[13] I do not consider the materials presented with Defendant's Second Motion to Supplement the Record and hereby DENY the motion (docket no. 63).

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.  See also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 250.  In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

## IV. DISCUSSION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), and venue is proper pursuant to 28 U.S.C. § 1391(b)(2).  Plaintiff's claims arise under the Copyright Act, 17 U.S.C. §§ 101, 501, and 28 U.S.C. § 1338(a) provides that federal district courts "shall have original jurisdiction of any civil action arising under any Act of Congress relating to . . . copyrights . . . ."  28 U.S.C. § 1338(a).  Defendant raises multiple issues with Plaintiff's claim. Those most central to resolution of this case include whether this Court should consider his Motion as one to dismiss the complaint or as one for summary judgment, whether this Court can consider the various exhibits submitted during briefing on the Motion, whether Plaintiff has

10

satisfied the prerequisites to filing a copyright suit, and whether Defendant's posting of Plaintiff's videos constitutes fair use.

### A. Exhibits and Alternative Motion for Summary Judgment

Defendant has filed a Motion to dismiss, or in the alternative, for summary judgment, and both parties have submitted exhibits with their briefs on the Motion.  Defendant submitted documents related to a FOIA request by Jason Smathers.   Defendant also submitted a declaration explaining his motivations for posting the Count One and Two Videos online. Finally, during briefing, Defendant submitted a declaration about the employment status of himself and his wife, and copies of the copyright applications that Plaintiff filed with the Copyright Office.  For his part, Plaintiff submitted emails from the "United States Copyright Office," which confirm application and payment for two works: (1) "Training Session: What You Need to Know about Islam—Base Theater," and (2) "Training Session: What You Need to Know about Islam—O-Club," and deposit of the "O-Club" work.

### 1. Exhibits Extrinsic to the Pleadings

Rule 12(d) prohibits district courts from considering evidence outside the pleadings on motions to dismiss, unless the process is converted to summary judgment.  *See* Fed. R. Civ. P. 12(d).  However, without risking conversion of the proceedings, courts can consider "documents attached to the complaint, as well as those attached to [a] motion to dismiss, so long as they are integral to the complaint and authentic," including documents "incorporated into the complaint." *Bala v. Commonwealth of Virginia Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (internal quotation marks omitted) (citing *Sec'y of State for Defence v. Trimble Navigation Ltd.,* 484 F.3d 700, 705 (4th Cir. 2007)); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).  The Fifth Circuit and some district courts have

refused to consider "documents that are mere evidence for the defense" as incorporated into the complaint. *See Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 663–64 (N.D. Tex. 2011).

If I were to consider the Motion under Rule 12(b)(6), I would consider the material submitted with Plaintiff's response to the Motion, as it is integral or incorporated into the Amended Complaint.  The Amended Complaint claims that Plaintiff "owns the copyright to the content of [the presentation in the Count One Video]; [and that] his copyright application is currently pending at the Copyright Office."  Am. Compl. ¶ 14.  Likewise, Plaintiff claims he "owns the copyright to the content of his presentation and has not authorized [Defendant] to use any portion of [the Count Two Video]."  Am. Compl. ¶ 22.

The Court can consider Exhibit A, attached to Plaintiff's response to the Motion.  This exhibit purports to show that the U.S. Copyright Office received Plaintiff's applications for copyrights over certain works on October 14, 2013.[14]  *See* Resp. to Mot. to Dismiss, Ex. A. Plaintiff may only satisfy the prerequisites to bring a copyright suit if, before bringing suit, he actually applied to the U.S. Copyright Office for copyrights in the works at issue.  Proof that he has applied for or owns copyright in the videos thus proves "integral to the complaint," and since an application for copyright is mentioned in the complaint, that application may also be "incorporated into the complaint" by reference.  *See Bala*, 532 F. App'x at 334; *Trimble*, 484 F.3d at 705.

If I consider most of the exhibits submitted with Defendant's Motion and in supplemental briefing, I must convert the motion to dismiss into one for summary judgment.  *See Bala*, 532 F. App'x at 334; Fed. R. Civ. P. 12(d).  These exhibits relate to Defendant's purpose in posting the

---

[14] Although the emails only confirm deposit of the "o_club" work in PDF form, and contain no confirmation of the "Base Theater" work's deposit, the parties have not contested that both works were deposited with the Copyright Office.  Additionally, transcripts of both works are present in the copies of Plaintiff's copyright applications that Defendant submitted to this Court on April 29, 2014.  *See* Copy of E-Application (docket no. 60).

videos, the method for obtaining the videos, and the content of the copyright applications Plaintiff submitted, among other things.  *See* Mot., Exs. A–C (docket no. 28); First Mot. to Supplement Record & Supplement (docket nos. 58, 60); Second Mot. to Supplement Record, Ex. A (docket no. 63).  The Amended Complaint never mentions how Defendant obtained the Count One and Count Two Videos, his motivations for posting the videos, alludes to any employment relationship between him and his family and Plaintiff, or specifies the contents of Plaintiff's copyright applications.

I could nevertheless consider the copies of Plaintiff's copyright applications, as the Amended Complaint refers to Plaintiff's pending application for copyright over the Count One Video, and his purported ownership of the copyright over the content in the Count Two Video. Am. Compl.  ¶¶ 14, 22.  These applications and their content are incorporated by reference into the Amended Complaint, or prove integral to it.  All other extrinsic exhibits refer to matters not referenced or discussed in the Amended Complaint, which are not integral to it or incorporated into it by reference.  Therefore, I cannot consider these other documents without converting the Motion into one for summary judgment.  *See, e.g.*, *Kaye*, 453 B.R. at 663–64 (N.D. Tex. 2011) (finding documents that are mere evidence for the defense are not incorporated into the complaint); *Caner v. Smathers*, No. 4:13-CV-494-Y, slip op. at 6 (N.D. Tex. Apr. 17, 2014) (declining to consider documents submitted with the same motion as has been filed in this case, without converting the proceedings into summary judgment).

### 2.  Motion to Dismiss or Motion for Summary Judgment

If a court considers evidence extrinsic to the pleadings on a motion to dismiss, it must "convert the proceeding to one for summary judgment."  *Bala*, 532 F. App'x at 334; Fed. R. Civ. P. 12(d).  "But, conversion of a motion to dismiss to one for summary judgment requires that

'[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Bala*, 532 F. App'x at 334 (citing *Trimble Navigation*, 484 F.3d at 705). Therefore, "such conversion is not appropriate where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours*, 637 F.3d at 448; *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 280–81 (4th Cir. 2013).

Several courts considering whether to convert a motion to dismiss into a motion for summary judgment have used Rule 56(d)'s standards to determine whether a nonmoving party has had an adequate opportunity for reasonable discovery. *See, e.g.*, *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 341–42 (D. Md. 2011); *Park v. Stewart*, No. CIV.A. ELH-13-3242, 2014 WL 1427419, at *3–4 (D. Md. Apr. 10, 2014). First, a nonmoving party "cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery." *Hamilton*, 807 F. Supp. 2d at 341–42 (quoting *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002)). The nonmoving party should file an affidavit or declaration "explaining why, 'for specified reasons, it cannot present facts essential to justify its opposition,' without needed discovery." *Id.*; Fed. R. Civ. P. 56(d); *but see Park*, 2014 WL 142719, at *4 (noting a court may excuse failure to file an affidavit upon other adequate objections from the nonmoving party informing the district court that more discovery is necessary).

Yet, a party "cannot simply demand discovery for the sake of discovery. *Hamilton*, 807 F. Supp. 2d at 342. A court may properly deny a nonmoving party's request for additional discovery "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs.*,

14

*Craven Cmty. Coll.*, 55 F.3d 943, 953 (4th Cir. 1995); *id.*; *see also Works v. Colvin*, 519 F. App'x 176, 183–84 (4th Cir. 2013) ("This court has long held that parties wishing to obtain additional discovery must 'specifically allege why the information sought would have been sufficient to create a genuine issue of material fact such that it would have defeated summary judgment.'").

For the reasons stated below and more fully throughout the fair use analysis, I find it proper to consider the Motion as one for summary judgment under Rule 56.

It is often the case that a court should not convert a motion during the early stages of a case, when the nonmoving party may not have had an opportunity to conduct discovery and to present all material "pertinent to the motion." *See Bala*, 532 F. App'x at 334. Yet, a court is not obligated to delay ruling on a motion simply for the sake of more discovery when a nonmoving party cannot point to specific information it seeks that might present a genuine issue of material fact counseling against summary judgment. *See Hamilton*, 807 F. Supp. 2d at 342; *Strag*, 55 F.3d at 953. The nonmoving party is obliged to file an affidavit or declaration with the specific facts it seeks through additional discovery, or at the very least, to otherwise inform the court of its need for further discovery. *Hamilton*, 807 F. Supp. 2d at 341–42; *Park*, 2014 WL 142719, at *4. If this Court finds that the information Plaintiff seeks would not present a genuine issue of material fact sufficient to defeat summary judgment, it may deny Plaintiff's request to conduct further discovery and consider the Motion as one for summary judgment. *See, e.g.*, *Hamilton*, 807 F. Supp. 2d at 342; *see also Strag*, 55 F.3d at 953; *Works*, 519 F. App'x at 183.

Plaintiff contested Defendant's requested stay of discovery, and Magistrate Judge Ballou ordered that a scheduling conference, initial disclosures, and written discovery take place during the pendency of this Motion. *See* Order on Mot. to Stay Discovery (docket no. 56). In his

15

response to this Motion, Plaintiff failed to mention any information he seeks through discovery that might present a dispute of material fact counseling against summary judgment.

Plaintiff also has not filed an affidavit or declaration pointing to specific information he seeks through discovery that might lead to contested issues of material fact.  In fact, Plaintiff's court filings have been noticeably sparse.  The Amended Complaint is brief, giving very little factual background about the issues in this case.  The response on this Motion is two pages long and worded in very general language, completely failing to address most of Defendant's arguments.  Although Plaintiff need only state a claim to relief that is plausible on its face at the 12(b)(6) stage, Plaintiff's unusual conduct gives rise to the impression that he seeks to reveal as little as possible to conceal for as long as possible that his claims lack merit.

That impression was corroborated by the conduct of Plaintiff's counsel at the hearing on this Motion, where he finally addressed many of Defendant's arguments.  For the first time, without the benefit of written argument for all to see, or of citation (except sometimes to his own beliefs or thoughts) Plaintiff cast aspersions on Defendant's motives and past association with Plaintiff and argued Defendant was not "qualified" under the fair use doctrine to criticize Plaintiff.  *See* Hearing Tr. at 9, 11, 14, 16, 21 Apr. 30, 2014 (docket no. 64) (arguing "I'm not sure Defendant in this case would even be qualified to comment" and attempting to distinguish "cyber terrorism" from "cyber criticism" by defining as "appropriate criticism from people that are qualified to render those opinions i[n] the market place and exchange of ideas in academia and elsewhere," such that "an anonymous cyber terrorist, in my mind, is not entitled to the same Fair Use protection as a publicly identified professional of Atheism," etc.).  Sifting carefully

16

through his arguments, I can discern only a few pieces of information Plaintiff seeks that he claims would reveal material factual disputes.[15]

This case largely revolves around whether Defendant's posting of the Count One and Two Videos constitutes fair use. Fair use is a complete defense to a copyright claim, meaning that "the fair use of a copyrighted work . . . is not an infringement of copyright." *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 307–08 (4th Cir. 2010) [hereinafter "*Bouchat I*"]. All of Plaintiff's objections to considering this Motion as one for summary judgment involve information related to the fair use analysis.

First, Plaintiff seeks additional information about Defendant's underlying purpose in posting the Count One and Two Videos. For the first time at the hearing on the Motion, Plaintiff's attorney represented that Defendant once worked for Plaintiff, and is a disgruntled "former employee" who "was fully supportive of [Plaintiff], worked under [Plaintiff] and was terminated and has, we believe, inappropriately attempted to work this copyright issue on Youtube and other places with the purpose of economically hurting [Plaintiff]," by engaging in "cyber terrorism" with a "vindictive and destructive" motivation. *See* Hearing Tr. at 9, 11, 14, Apr. 30, 2014 (docket no. 64). Plaintiff suggests that discovery would uncover information about Defendant's motivations that would show he had an improper purpose, like revenge, in posting the videos under the fair use analysis. Second, Plaintiff claims discovery might reveal that Defendant profited from posting the videos online and might reveal "what impact this has had on [Plaintiff's] ability to function and continue in his career." *Id.* at 11, 12, 20 ("we don't

---

[15] I note that when I directly asked Plaintiff's counsel what issues of material fact might exist in this case, he did not provide a direct answer. He did refer in a roundabout way to the purpose and character of the use, and to the fact that Defendant used the entire video. *See* Hearing Tr. at 24–27, Apr. 30, 2014 (docket no. 64). I have cobbled together those objections and others he made during the hearing as his objections to deciding this Motion on summary judgment, since he has not more directly objected and set out specific issues of material fact that discovery would uncover. I observe he has had more than adequate notice I might consider this Motion on Summary Judgment, both from the captioning of this Motion, in his own reference to that Motion in the response, and during the hearing.

know, for example, . . . if, . . . [Defendant] is in any way commercially making money off of this," for example through "lectures or speeches or other things," and that groups might choose not to invite Plaintiff to present to them, diminishing value to Plaintiff, because the video was "available online for free").  Again for the first time at the hearing, Plaintiff argued any profit Defendant earned from posting the videos, or any market harm to Plaintiff, would prevent classifying that posting as fair use.  Finally, Plaintiff's counsel made astounding claims during the hearing that discovery would affect the fair use analysis by showing that Defendant was not "qualified" to direct "appropriate criticism" at Plaintiff, unlike "people that are qualified to render those opinions i[n] the market place and exchange of ideas in academia and elsewhere," and therefore Defendant could not assert the fair use defense.  Hearing Tr. at 11, 14, Apr. 30, 2014 (docket no. 64).

   As I explain more fully below, even if Plaintiff obtained all the information he seeks through further discovery, that information would not raise a dispute of material fact. Defendant's use of the videos to criticize Plaintiff as a disingenuous public figure would still qualify as fair use even if: (1) Defendant was a disgruntled former employee who sought to harm Plaintiff by criticizing contradictions in his narratives; and (2) Defendant profited from that criticism and reduced the market for Plaintiff's work through the force of his criticism.  *See generally Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 591–92 (1994) (noting that because "parody may quite legitimately aim at garroting the original, destroying it commercially as well as artistically, the role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement which usurps it." (internal quotation marks and citations omitted)); *NXIVM*, 364 F.3d at 482 ("That the fair use, being transformative, might well

harm, or even destroy, the market for the original is of no concern to us so long as the harm stems from the force of the criticism offered.").

Plaintiff's spurious assertion that fair use only applies where a speaker "qualified to render . . . opinions" or to level "appropriate criticism" at a public figure proves ludicrous on its face.  Hearing Tr. at 11, 14, Apr. 30, 2014 (docket no. 64).  The First Amendment's protections, advanced by the fair use defense, have never applied to some bizarre oligarchy of "qualified" speakers.  Excluding speakers who criticize public figures from protection due to the speaker's social status, level of education, or other nebulous "qualifying" factors would nullify the broad protections the First Amendment is meant to provide, and stifle the open discourse that stands against tyranny, intolerance, and oppression.  Plaintiff himself has extolled the virtues of these protections and warned against the dangers of censorship and "misinformation": "The one great exponent of America is the freedom to think and rationally believe and reasonably consider for yourself."  Mot., Ex. A, Application for Copyright of "Training Session: What You Need to Know About Islam – Base Theater," [hereinafter "Base Theater Application"] at 1, 2. Conveniently, when criticism is directed at him, Plaintiff comes before this Court and argues that it should restrict First Amendment fair use protection to some amorphous group of "qualified" speakers.  When pressed at the hearing to provide authority for this counterintuitive proposition, Plaintiff's counsel fell back on his "belie[fs]" and failed to do so.  Hearing Tr. at 17–18, Apr. 30, 2014 (docket no. 64).  As Defendant's counsel aptly observed during the hearing, if Plaintiff's counsel intends to make such outlandish arguments, he should go to the trouble of "typ[ing] out the citations" for any supporting authority.  *Id.* at 24.  I doubt such authority exists.

I therefore consider the Motion as one for summary judgment, because although this case is in its early stages, I find that more discovery would not give rise to a dispute of material fact

preventing the entry of summary judgment.  Even if Plaintiff obtained the information he seeks,

no reasonable juror could find for Plaintiff.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  I will not allow Plaintiff to strategically prolong this case through an unsupported

request for further discovery.  Furthermore, I will rely on the exhibits submitted during briefing

on the Motion,[16] since I am considering it on summary judgment.  *See* Fed. R. Civ. P. 12(d).

### B.  Plaintiff's Lack of Response to Most of Defendant's Arguments

Defendant's Motion raises a plethora of arguments supporting Defendant's contention

that he did not infringe a copyright in posting the Count One and Two Videos to YouTube.com.

Plaintiff's response attempts to answer only two of them: (1) whether he satisfied prerequisites to

copyright suit by applying for copyrights in the videos; and (2) whether his failure to apply for

copyrights until October 2013 meant that this Court should give his applications no weight.  *See*

Resp. to Mot. to Dismiss at 1–2.  Many district courts in this circuit and others, including on

motions to dismiss, have "recognized the general principle that a party who fails to address an

issue has conceded the issue."  *Kinetic Concepts, Inc. v. Convatec Inc.*, No. 1:08CV00918, 2010

WL 1667285, at *8–9 (M.D.N.C. Apr. 23, 2010) (considering motion to dismiss and collecting

cases for the proposition); *see also, e.g.*, *Brand v. N. Carolina Dep't of Crime Control & Pub.

Safety*, 352 F. Supp. 2d 606, 618 (M.D.N.C. 2004); *Maryland Elec. Indus. Health Fund v.

MESCO, Inc.*, No. CIV.A. ELH-12-505, 2014 WL 853237, at *7 (D. Md. Feb. 28, 2014).

Before the hearing on the Motion, Plaintiff had failed to address or contest Defendant's

assertions that Defendant posted the videos as a fair-use criticism of Plaintiff, or that Plaintiff

waived his exclusive rights or gave license to others to use the videos.  At the hearing, Plaintiff's

counsel conceded several issues, and contested others.  For one thing, Plaintiff's counsel

---

[16] I need not and do not consider the material within and attached to the Second Motion to Supplement the Record (docket no. 63), as noted previously.

admitted that Plaintiff never submitted an application to the U.S. Copyright Office for the Count Two Video.  Hearing Tr. at 12–13, Apr. 30, 2014 (docket no. 64) ("THE COURT: Well, didn't he actually though apply for a copyright as to the video entitled Ergun Educated in Cairo, Egypt? MR GIBBS: Not that particular video, no, sir.").  Therefore, as explained further herein, Plaintiff has not satisfied an essential precondition for suing Defendant for infringement of the Count Two Video, and I will dismiss that claim.  *See Apple Barrel Prods., Inc. v. Beard,* 730 F.2d 384, 386–87 (5th Cir. 1984) (finding that to bring suit for copyright infringement, a plaintiff must "prove payment of the required fee, deposit of the work in question, and receipt by the Copyright Office of a registration application.").

Plaintiff's counsel also conceded that Plaintiff is a public figure.  During the hearing, he called Plaintiff "a college pres[ident]," and asserted that he "has written a number of books," and that he "is someone that is out in the public square."  Hearing Tr. at 10, Apr. 30, 2014 (docket no. 64).  He later compared Plaintiff to "authors, public speakers, [and] educational leaders," and noted Plaintiff acts as a "spokesperson and as an academ[ician]."  *Id.* at 10, 28.  Indeed, the United States Marines wanted to hear him speak such that Plaintiff "donated the event . . . almost like a pro bono or a charity event for the Military" when he made his presentation in the Count One Video, and Plaintiff's counsel suggested Plaintiff was donated his travel expenses.  *Id.* at 11, 14.  Plaintiff only partially contested that he waived or gave license for others to use the Count One and Count Two Videos.  Although Plaintiff could not remember coming to any oral or written agreement with the U.S. Marines about his presentations, he asserted he gave those presentations with the personal understanding that he would retain the rights to his work. Plaintiff avers that he could not find any written agreement concerning these presentations.

21

Although Plaintiff has not filed suit against the United States government for releasing the Count One Video through a FOIA request, Plaintiff asserted that he still considered the content his own.

### C.  Preconditions to Copyright Suit: Application or Registration Approach

Copious judicial ink has been spilled over the proper prerequisites for bringing a copyright suit in federal court.  Although the United States Court of Appeals for the Fourth Circuit has yet to rule on the question, other circuits are divided about whether a litigant need only apply for a copyright and provide proof of that application before bringing suit in federal court (the "Application Approach"), or whether a litigant must provide proof of the U.S. Copyright Office's grant or denial of copyright registration before suit can be initiated (the "Registration Approach").  *Compare La Resolana Architects, PA v. Clay Realtors Angel Fire,* 416 F.3d 1195, 1202–04 (10th Cir. 2005) *with Cosmetic Ideas, Inc. v. IAC/Interactivecorp.,* 606 F.3d 612, 615–21 (9th Cir. 2010).  The United States Supreme Court has resolved that a court's jurisdiction does not hinge on this question.  *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166, 170 (2010) (holding that 17 U.S.C. § 411(a), which "imposes a precondition to filing a claim," "does not restrict a federal court's subject-matter jurisdiction.").

### 1.  Registration and Application Approaches

Plaintiff alleges copyright infringement under 17 U.S.C. §§ 106 and 506.  Section 106 grants "[e]xclusive rights in copyrighted works":

> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . .

17 U.S.C. § 106 (1)–(3).  Section 501(b) of Title 17 notes that the "legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to

institute an action for any infringement of that particular right committed while he or she is the

owner of it."  17 U.S.C. § 501(b).  Section 411(a), in turn, says that

> no civil action for infringement of the copyright in any United States work shall
> be instituted until preregistration or registration of the copyright claim has been
> made in accordance with this title. In any case, however, where the deposit,
> application, and fee required for registration have been delivered to the Copyright
> Office in proper form and registration has been refused, the applicant is entitled to
> institute a civil action for infringement if notice thereof, with a copy of the
> complaint, is served on the Register of Copyrights. The Register may, at his or her
> option, become a party to the action with respect to the issue of registrability of
> the copyright claim by entering an appearance within sixty days after such
> service, but the Register's failure to become a party shall not deprive the court of
> jurisdiction to determine that issue.

17 U.S.C. § 411(a).

Interpreting this language, courts have divided over what is required to show "registration

of the copyright claim . . . made in accordance" with Title 17.  *Id.*  The United States Courts of

Appeals for the Tenth and Eleventh Circuits, along with district courts in Maryland and

elsewhere, have found that the U.S. Copyright Office's grant or denial of registration to a

copyright claim is a precondition for suit.  *See, e.g.*, *La Resolana Architects, PA v. Clay Realtors

Angel Fire,* 416 F.3d 1195, 1202–04 (10th Cir. 2005); *M.G.B. Homes, Inc. v. Ameron Homes,

Inc.,* 903 F.2d 1486, 1489 (11th Cir. 1990), *abrogated in part on other grounds by Reed Elsevier*,

559 U.S. at 170; *Mays and Assocs., Inc. v. Euler,* 370 F. Supp. 2d 362, 368–370 (D. Md. 2005).

Under this Registration Approach, courts have reasoned that the requirements for registration of

a copyright are contained in sections 408 and 410 of the Copyright Act, and that the language of

these provisions suggests that registration must include the final decision of the U.S. Copyright

Office over whether to grant or deny registration.

The Tenth Circuit reasoned:

> Registration is satisfied by completing the following steps:
> a. application and payment of fee, § 408;
> b. deposit of a copy of the copyrightable material, § 408;
> c. examination by the Register of Copyrights, § 410;
> d. registration (or refusal to register) by the Register, § 410;
> e. issuance of certificate of registration, § 410.
> The plain language of the statute thus requires a series of affirmative steps by both the applicant and the Copyright Office. No language in the Act suggests that registration is accomplished by mere receipt of copyrightable material by the Copyright Office.

*La Resolana Architects*, 416 F.3d at 1200.  The Tenth Circuit also cited section 410(a), which provides that the Register of Copyrights ("Register") "*shall register* the claim and *issue* to the applicant a certificate of registration," but only "after examination."  *Id.* at 1201.  Likewise, section 410(b) states that the Register "shall *refuse* registration" in certain circumstances.  *Id.* Finally, section 408 notes that "the owner of copyright . . . *may* obtain registration of the copyright claim by delivering to the Copyright Office the deposit specified by this section, together with the application and fee specified by sections 409 and 708."  *Id.*

In addition to this statutory analysis, other courts have expressed hesitation to "prematurely . . . 'prejudge' a determination to be made by the Copyright Office," over which the Copyright Office exercises significant expertise.  *Mays & Associates, Inc. v. Euler*, 370 F. Supp. 2d 362, 368–70 (D. Md. 2005).

The United States Courts of Appeals for the Fifth, Seventh, Eighth, and Ninth Circuits, along with district courts in North Carolina, the Eastern District of Virginia, and elsewhere, have found that a litigant's completed application for a copyright sufficiently evinces "registration" under 17 U.S.C. § 411(a).  *See, e.g.*, *Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612, 615–21 (9th Cir. 2010); *Action Tapes, Inc. v. Mattson,* 462 F.3d 1010, 1013 (8th Cir. 2006); *Chi.*

24

*Bd. of Educ. v. Substance, Inc.,* 354 F.3d 624, 631 (7th Cir. 2003); *Apple Barrel Prods., Inc. v. Beard,* 730 F.2d 384, 386–87 (5th Cir. 1984); *Phoenix Renovation Corp. v. Rodriguez*, 403 F. Supp. 2d 510, 514 (E.D. Va. 2005) (citing 17 U.S.C. § 408(a)); *Iconbazaar, L.L.C. v. America Online, Inc.,* 308 F. Supp. 2d 630, 634 (M.D.N.C. 2004); *Secure Servs. Tech., Inc. v. Time & Space Processing Inc.*, 722 F. Supp. 1354, 1363–64 (E.D. Va. 1989).  A litigant may prove registration under this Application Approach by showing payment of the required fee, deposit of the work in question, and receipt by the Copyright Office of a registration application." *Apple Barrel Prods.*, 730 F.2d at 386–87.

Courts using the Application Approach read section 408(a) "to mean that a registration occurs at the time a work's owner deposits a proper application with the Copyright Office," when it says that "the owner of copyright or of any exclusive right in the work *may obtain registration of the copyright claim by delivering* to the Copyright Office the deposit specified by this section, together with the application and fee specified by sections 409 and 708." *Phoenix*, 403 F. Supp. 2d at 514 (citing 17 U.S.C. § 408(a)).  Section 410(d)'s statement that "[t]he effective date of a copyright registration is the day on which an application, deposit, and fee, which are later determined . . . to be acceptable for registration, have all been received in the Copyright Office" is taken to mean that registration is "complete upon application," not just that registration certificates are backdated.  *Id.* (citing 7 U.S.C. § 410(d)).

Finally, even if the statutory scheme is ambiguous about what constitutes "registration" under § 411(a), many courts reason that the Application Approach better comports with policy concerns and Congress' purpose in passing the Copyright Act.  First, if a court waited for the Copyright Office to issue or deny registration, "the owner of a copyright would be left in legal limbo" in the meantime, which could pose a significant delay and risk of copyright dilution by an

infringer.  *Id.* at 414–15; *Iconbazaar*, 308 F. Supp. 2d at 634.  Second, even waiting for the Copyright Office would not necessarily defer to its expertise, because "the owner may bring an infringement suit even after the Copyright Office denies his or her application."  *Phoenix Renovation*, 403 F. Supp. at 515; *Iconbazaar*, 308 F. Supp. 2d  at 634.  *See also Cosmetic Ideas*, 606 F.3d at 615–21.  Although copyrights are backdated to the date of completed application, many courts have found that allowing the Copyright Office to first exercise its expertise should not warrant delaying litigation while the alleged infringer may continue to dilute the copyright.  *Phoenix Renovation*, 403 F. Supp. at 515; *Iconbazaar,* 308 F. Supp. 2d  at 634; *Cosmetic Ideas*, 606 F.3d at 615–21.

The Fourth Circuit has not interpreted this exact issue.  In a case concerning whether the Register of Copyrights has the power to refuse to register a proposed work of art, the Fourth Circuit found that the Register indeed had discretion over registration – he was not limited to the power to receive, deposit, and issue a registration certificate.  *Eltra Corp. v. Ringer*, 579 F.2d 294, 299 (4th Cir. 1978).  The pertinent discussion occurred in a footnote, where the court in *dicta* noted that filing requirements had changed between the 1909 Copyright Act and the 1976 Amendments.  Therefore, the plaintiff no longer needed to file a mandamus upon the Register's denial of a registration certificate.  *Id.* at 296 n.4.  Instead, the 1976 Amendments to the Copyright Act had "eliminate[d] any need to secure registration as a prerequisite to an infringement suit and authorize[ation] of suit for infringement."  *Id.*  So instead of filing a mandamus, a party could sue in federal court "so long as the Register is notified of the litigation," even if the Register had denied the copyright claim.  *Id.*

In agreement with the Fifth, Seventh, Eighth, and Ninth Circuits, and with district courts in Virginia and North Carolina, I find that the Application Approach represents a better reading

26

of the provisions of the Copyright Act at issue, and that it better effectuates the policies Congress meant to promote through that Act.  Therefore, I will apply the Application Approach to determine whether Plaintiff has satisfied the preconditions to filing a copyright suit in this Court.

## 2.  Plaintiff's Amended Complaint and Response

In his response to the Motion, Plaintiff submitted emails confirming that he submitted and paid for two copyright applications.  Under the Application Approach, a litigant must show payment of the required fee, deposit of the work in question, and receipt by the Copyright Office of a registration application. *Apple Barrel Prods.*, 730 F.2d at 386–87.  Plaintiff's response purports to show that the U.S. Copyright Office received his complete applications for copyrights over certain works on October 14, 2013.  *See* Resp. to Mot. to Dismiss, Ex. A.  His response also shows that he submitted payment for two titles.  Although he has only shown that he deposited one of the works, the copies of his applications that Defendant submitted show that Plaintiff submitted two transcripts that correspond with his confirmed applications.  *Compare* Resp. to Mot., Ex. A, at 3–4 (confirming receipt of "application and payment" for the works entitled "Training Session: What You Need to Know About Islam—Base Theater," assigned number "1-100652651," and "Training Session: What You Need to Know About Islam—O-Club," assigned number "1-1006532048."), *with* First Supplement to Record, at 1, 23 (reporting "a true representation of the information submitted to the Copyright Office in association with the electronic application for registration of material identified as TRAINING SESSION: WHAT YOU NEED TO KNOW ABOUT ISLAMAC BASE THEATER service number SR 1-1006528651," and "TRAINING SESSION: WHAT YOU NEED TO KNOW ABOUT ISLAMAC O-CLUB service number SR 1-1006532048.").  Plaintiff confirmed during the

hearing that the "applications that Defendant submitted and [his] e-mails correspond to the [C]ount [O]ne [V]ideo." Hearing Tr. at 30, Apr. 30, 2014 (docket no. 64).

It is uncontested that Plaintiff submitted applications to the U.S. Copyright Office for two works. According to Defendant, the work entitled, "Training Session: What You Need to Know About Islam—O-Club" corresponds to the Count One Video he posted in full on YouTube.com. Mot. at 4–5. Plaintiff has not contested this assertion, and has therefore conceded it.[17] *See Kinetic Concepts*, 2010 WL 1667285, at *8–9. Plaintiff and Defendant's submissions show that Plaintiff paid the required fee, deposited the work relating to the Count One Video, and that Copyright Office received his registration application. I adopt the application approach and find that Plaintiff has satisfied the preconditions for filing a copyright suit concerning the Count One Video. Plaintiff's counsel has conceded that Plaintiff never applied for a copyright over the Count Two Video. Under either approach, Plaintiff has not satisfied the prerequisites for filing a copyright suit concerning the Count Two Video, and I therefore dismiss Count Two.

### D.  Fair Use

Common law doctrine has long safeguarded the "fair use" of material otherwise protected under the Copyright Act. In 1976, Congress codified this doctrine in 17 U.S.C. § 107, but courts have continued to rely on case law to flesh out the contours of the fair use doctrine. *See Bouchat I*, 619 F.3d 301, 307–08 (4th Cir. 2010) ("Congress meant § 107 to restate the present judicial doctrine of fair use . . . and intended that the courts continue the common-law tradition of fair-use adjudication." (quoting *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 576 (1994))).

Section 107 provides that, notwithstanding section 106,

---

[17] Even if the Count One Video corresponds with the other included application, the two contain sufficiently similar content that the analysis would remain the same. Both concern presentations in which Plaintiff discussed his background and used that proffered expertise to discuss Islamic religion and culture.

the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, *for purposes such as criticism, comment, news reporting,* teaching (including multiple copies for classroom use), scholarship, or research, *is not an infringement of copyright.* In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(**1**) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(**2**) the nature of the copyrighted work;
(**3**) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(**4**) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107.  When considering whether an alleged infringement is instead a fair use, courts should weigh the results of each factor together, in light of the purposes of copyright." *Bouchat I*, 619 F.3d at 307–08.

### 1.  The Purpose and Character of the Use

The purpose and character of a given use weigh heavily in the fair use analysis.  A use more likely qualifies as fair if a work is used for the purpose of criticism or comment, two of the enumerated fair use exceptions in § 107.  *Id.*  To fall within this statutory language, an alleged infringer must also show the use was "transformative," or "one that employs the copyrighted work in a different manner or for a different purpose from the original, thus transforming it."  *Id.* at 308–09.  This protection for transformative uses reflects "the 'considerable latitude for scholarship and comment' secured by the fair use doctrine," in order to "protect[] the core value of free expression from excessive litigation and undue restriction."  *Bouchat v. Baltimore Ravens*

*Ltd. P'ship*, 737 F.3d 932, 944 (4th Cir. 2013) [hereinafter "*Bouchat II*"] (citing *Eldred v. Ashcroft,* 537 U.S. 186, 219 (2003)).

As for the use's character, a court must consider "whether [the] use is of a commercial nature or is for nonprofit educational purposes." *Bouchat I*, 619 F.3d at 310 (quoting 17 U.S.C. § 107(1)) (internal quotation marks omitted). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain *but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price*." *Id.* at 310–11 (emphasis added).

The evidence before the Court in the instant case shows that the purpose and character of Defendant's use of Plaintiff's videotaped speech weigh in favor of finding a fair use. Furthermore, even if Plaintiff were able to discover and submit the evidence he proposes, the purpose and character of the use would still weigh in favor of fair use.  Defendant has submitted a sworn declaration that he posted the Count One Video in February 2012 for the purpose of making "religiously based criticism against a public figure on a matter of public concern . . . based on [his] sincerely held religious beliefs" that "it is morally wrong to lie, and especially wrong to lie in a church and to U.S. Marines."  Mot., Ex. A, Autry Decl. ¶¶ 19–21, 40. Defendant attended Liberty University's "seminary while Dr. Caner was Dean" and "[w]hen Dr. Caner's misrepresentations became public, I desired to expose Dr. Caner, a public figure, for his dishonesty," especially after he continued to deny that he had made misrepresentations.  Mot., Ex. A, Autry Decl. ¶¶ 21, 22.  Plaintiff has essentially conceded that Defendant posted the Count One Video for the purpose of criticism, although he questions whether Defendant "would even be qualified to comment as his motivation is more that of a former employee," and thinks that "if

the motive is purely to be destructive," such posting qualifies as "cyber terrorism," that "is different than cyber criticism."  Hearing Tr. at 9, 11, 14, Apr. 30, 2014 (docket no. 64).

Clearly, Defendant posted the Count One Video for the transformative purpose of criticizing Plaintiff.  He provided links to the full Count One Video in blog posts that overtly contrasted Plaintiff's statements in the videos with statements Plaintiff had made in other speeches and writings. Mot., Ex. A, Autry Decl. ¶¶ 23–24.  Defendant transformatively used a video of Plaintiff's presentation to the Marines, not to disseminate or profit from its message about Plaintiff's background in Islam, but to "expose" contradictions and "dishonesty" in the testimony of a well-known evangelist and seminary dean.  *Id.* at 21, 22.  *See, e.g.*, *Ascend Health Corp. v. Wells*, No. 4:12-CV-00083-BR, 2013 WL 1010589, at *12–14 (E.D.N.C. Mar. 14, 2013) (finding that posting photos of a psychiatric facility on a blog with critical comments weighed in favor of fair use, especially where there was no indication the blogger profited from her postings); *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630, 639 (4th Cir. 2009) ("The use of a copyrighted work need not alter or augment the work to be transformative in nature . . . . [T]he fact that there was no substantive alteration to the works does not preclude the use from being transformative in nature.").  As Defendant implies, this criticism lies at the heart of what fair use seeks to protect, in that it targets the allegedly inconsistent statements of a person who has placed himself in the public spotlight through the very narratives now under fire.

I must also consider "the character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  However, even commercial and for-profit uses are allowed as fair uses if they are transformative critical, historical, or educational uses, among others.  17 U.S.C. § 107; *New Era Publications Int'l, ApS v. Henry Holt & Co., Inc.*, 695 F. Supp. 1493, 1506–07 (S.D.N.Y. 1988) (noting that profit does

31

not weigh against fair use, as practically all publishers stand to profit from critical or educational works) *aff'd*, 873 F.2d 576 (2d Cir. 1989).  Defendant's sworn declaration states that he "did not post the videos to make money and believed that the production constituted fair use," and that he has, to the best of his knowledge, never experienced "any financial benefit" from posting the videos on YouTube.  Mot., Ex. A, Autry Decl. ¶¶ 25, 26.  During the hearing, Plaintiff suggested that he thinks discovery might uncover some profit made by Defendant from these postings. Hearing Tr. at 20, Apr. 30, 2014 (docket no. 64) ("we don't know, for example, . . . if, . . . [Defendant] isin any way commercially making money off of this.  We've been told that there may be some lectures or speeches or other things.").  Bloggers sometimes profit from their posts through advertisements or other revenue, just as publishers profit from book reviews and other critiques.  Even if Plaintiff showed that Defendant wished to profit from criticizing Plaintiff, or that he did profit from his blog posts containing the Count One Video, the transformative, critical use of the video still receives fair use protection.  *See New Era Publications*, 695 F. Supp. at 1506–07; *Bouchat I*, 619 F.3d at 310–11.

During the hearing on this Motion, Plaintiff also argued that Defendant's purposes should not fit within the fair use exception because he expects to uncover evidence through discovery that Defendant is a disgruntled "former employee" of Plaintiff who had been fired.  *See* Hearing Tr. at 9, 21 Apr. 30, 2014 (docket no. 64).  According to Plaintiff, Defendant had once been "fully supportive of [Plaintiff] and his message and his organization" and after being "terminated," sought to persecute Plaintiff as a "cyber terrorist" through "vindictive[ly]" posting the Count One Video and using it to criticize Plaintiff.  *Id.* at 9, 14, 16, 21.  Even if Defendant

discovered and admitted the evidence he seeks,[18] it would not weigh against Plaintiff in the fair use analysis.

Plaintiff argues, as usual without citation, that the purpose of a use should account for any animus an alleged infringer bears toward the plaintiff.  Generously interpreted, Plaintiff may be misconstruing case law finding that courts should account for the bad faith of an infringer who grafts from another's work for their own profit.  *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562–63 (1985) (reasoning that fair use "distinguishes between a true scholar and a chiseler who infringes a work for personal profit," presupposing "good faith and fair dealing" such that the analysis should consider the "propriety of the defendant's conduct" and the defendant's intent (internal quotation marks omitted)).  Indeed, copyright law focuses most intensely on whether the purpose of the use is to "exploit[] the copyright material without paying the customary price."  *Bouchat I*, 619 F.3d at 310–11.  Many speakers who criticize others using copyrighted works may be motivated to do so based on dislike or distrust of the object of their criticism.  If that were a barrier to free speech, fair use would offer little protection, and the analysis would delve courts into a complex and highly subjective inquiry about the motivations and relationships between parties.

Instead, the analysis properly focuses on preventing the unscrupulous appropriation of another's work for personal profit.  "To enjoin [the publication of criticism] . . . would merely be allowing a doctrine designed to protect an artist's commercial rights to be perverted into the service of suppression of important critical or historical inquiry."  *New Era Publications Int'l, ApS v. Henry Holt & Co., Inc.*, 695 F. Supp. 1493, 1502–03 (S.D.N.Y. 1988) *aff'd*, 873 F.2d 576 (2d Cir. 1989).

---

[18] Although Defendant submitted a Second Motion to Supplement the Record with Defendant's testimony on these issues, I need not and do not consider that Motion or what it contains in deciding this Motion.

The court in *New Era* emphasized that the fair use doctrine protects a biographer in publishing quotations from the early letters of a "religious leader . . . renowned for his selfless kindness, liberality of spirit and sympathy for the sufferings of others" to show "greed, callous indifference, and . . . racial and religious bigotry" under the fair use doctrine. *Id.* Likewise, it protects a journalist in publishing the old letters of a politician who "campaigns on his decorations for wartime bravery and his strong law and order position" when those letters "seem to acknowledge that he did not participate in combat, was mistakenly decorated and spent his military career as a black marketeer in association with hoodlums." *Id. See also NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477–79 (2d Cir. 2004) (finding transformative, critical use weighed in favor of fair use when competitor posted portions of a copyrighted manual online to analyze and criticize those materials, and finding even if competitor posted in bad faith with knowledge the manual was illegally obtained, transformative use outweighed that bad faith); *Hustler Magazine Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1151–52 (9th Cir. 1986) (finding fair use even though religious leader had dual purposes of profiting and criticizing in sending copyrighted work to his supporters along with solicitations for money).

Even considering the evidence Plaintiff seeks in discovery, there is simply no indication Defendant engaged in the type of appropriation the Copyright Act seeks to prevent.[19]  Instead, all the evidence proposed and submitted by both parties suggests Plaintiff has filed this suit to suppress legitimate criticism of alleged contradictions in the narrative that supported his rise to prominence.  The purpose and character of Defendant's use weigh strongly in favor of finding fair use.

## 2. The Nature of the Copyrighted Work

---

[19] For this reason and others described herein, I find it proper to consider the Motion on summary judgment and deny Plaintiff any further discovery.

"The scope of fair use is greater when 'informational' as opposed to more 'creative'
works are involved." *Hustler*, 796 F.2d at 1153–54 (quoting *Harper & Row*, 471 U.S. at 563, as
saying "The law generally recognizes a greater need to disseminate factual works than works of
fiction or fantasy."); *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 455 n. 40
(1984) ("Copying a news broadcast may have a stronger claim to fair use than copying a motion
picture.").  The transcript Plaintiff submitted to the Copyright Office with his application for the
Count One Video shows his presentation therein was clearly intended to be informational.  In the
transcript, Plaintiff answers questions about Islam and jihad, and purports to speak about how
Muslims abroad view Americans, based on his upbringing in that environment.  I find the Count
One Video is an informational work, and is therefore entitled to less protection.  This factor
weighs in favor of finding fair use.

### 3. The Amount and Substantiality of the Portion Used

Although reproducing a work in full "'militat[es] against a finding of fair use,'" such use
"'does not preclude it.'"  *Bouchat II*, 737 F.3d at 942–43 (quoting *Sony Corp*., 464 U.S. at 449–
50). "Ultimately, 'the extent of permissible copying varies with the purpose and character of the
use." *Id.*  When an alleged infringer has "no choice but to [use the whole work] in order to fulfill
[a] 'legitimate transformative purpose,' . . . the transformativeness of the use and the character of
[the] work" lead courts to "give very little weight to this factor." *Id.*   Indeed, "it would be
senseless to permit the [alleged infringer] to use the [work at issue] for factual, historical
purposes, but permit [the alleged infringer] to show only a half, or two-thirds of it." *Id.*

Plaintiff noted during the hearing on this Motion that Defendant used the entirety of a
presentation Plaintiff made to the Marines in the Count One Video.  Hearing Tr. at 10, Apr. 30,
2014 (docket no. 64) ("They pretty much conceded number three, the amount and substantiality

of the portion.  They used the whole thing.").  Defendant claims he did so to provide more

forceful criticism, so he could point out contradictions without readers questioning whether he

had taken Plaintiff's statements out of context.  Mot., Ex. A, Autry Decl. at ¶ 24.  I need not rely

on Defendant's explanation to find that a criticism involving contradictory statements may

necessitate use of an entire work.  Just as the Fourth Circuit found it was proper for the NFL to

use an entire copyrighted logo for historical and factual purposes, and that the transformative

nature of the use outweighed the amount of the work used, I find the transformative nature of

Defendant's use outweighs the fact that he used the entire work in the Count One Video.

Although this factor weighs slightly against fair use, I find it would be senseless to allow

Defendant to criticize Plaintiff, but only less effectively, by using portions of the video.  *See*

*Bouchat II*, 737 F.3d at 942–43.  I give very little weight to this factor.  *Id.*

### 4.  The Effect of the Use on the Work's Value or Market

The fourth and final factor is "undoubtedly the single most important element of fair

use."  *Bouchat I*, 619 F.3d at 312. Under this factor, a court is

> required to determine whether the defendants' [use of the work] would materially
> impair the marketability of the work and whether it would act as a market
> substitute for it.  *A transformative use renders market substitution less likely and
> market harm more difficult to infer.*

*Bouchat II*, 737 F.3d at 943 (internal quotation marks and citations omitted) (emphasis added).

To negate fair use under this factor, "one need only show that if the challenged use should

become widespread, it would adversely affect the potential market for the copyrighted work."

*Id.*

Forceful criticism that has the potential to destroy the market for a copyrighted work does

not prevent a finding of fair use.  *See, e.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569,

591–92 (1994) (noting that because "parody may quite legitimately aim at garroting the original,

destroying it commercially as well as artistically, the role of the courts is to distinguish between biting criticism that merely suppresses demand and copyright infringement which usurps it." (internal quotation marks and citations omitted)); *NXIVM*, 364 F.3d at 482 ("That the fair use, being transformative, might well harm, or even destroy, the market for the original is of no concern to us so long as the harm stems from the force of the criticism offered."); *New Era Publications*, 695 F. Supp. at 1506–07.

Here, Defendant transformatively used a video of Plaintiff's presentation to the Marines to criticize Plaintiff's life story and credentials.  This transformative use "renders market substitution less likely and market harm more difficult to infer," mostly because transformative uses are less likely to reside at the core of copyright protection, with thefts of others' original works.  *See Bouchat II*, 737 F.3d at 943.  Hence, it has long been established that fair use protects the transformative use of a work to criticize, even when the parody or criticism is so forceful that it may eliminate the market for the object of the criticism.  To do otherwise would stifle free-flowing debate and criticism in the name of protecting original works and creative labors, taking copyright protections far beyond their intended bounds.

For these reasons, Plaintiff's request to obtain more discovery on the market effect of Defendant's alleged infringement would not uncover any disputes of material fact that could change the outcome of this Motion.  Plaintiff speculated that posting the entire presentation from the Count One Video online could prevent groups from asking Plaintiff to speak at their gatherings, because they would already have his speech.  These assertions do not change the analysis because Defendant's use was critical and transformative.  Defendant's biting criticism might suppress demand for Plaintiff's sermons and lectures, and it might well harm, or even destroy the market for Plaintiff and his testimony.  *Campbell*, 510 U.S. at 591–92; *NXIVM*, 364

F.3d at 482.  But Defendant's use has the potential to suppress demand through forceful criticism *rather than* the potential to usurp demand or profit by using Plaintiff's original work in a similar fashion.  *Campbell*, 510 U.S. at 591–92.  Therefore, the effect of the alleged infringement on the value of Plaintiff's work, or on the market for that work, does not weigh against finding fair use.  The Copyright Act does not protect Plaintiff against the type of market harm that may potentially occur from another's forceful criticism of his narrative.  *Bouchat II*, 737 F.3d at 943.

### 5. Conclusion

In sum, I find that the § 107 factors weigh strongly in favor of finding that Defendant's use of the Count One Video constitutes fair use.  The purpose and character of the use, including whether that use was for commercial purposes, weigh in favor of fair use.  Defendant's use was transformative, for the purposes of criticism, and even if he profited from the use, the purpose and character of his critical use of the Count One Video weigh in favor of fair use.  The nature of the copyrighted work is more factual than creative, and therefore it receives less protection under the Copyright Act – this factor weighs in favor of finding a fair use.  The amount and substantiality of the portion used weighs slightly against fair use, as Defendant used the entire work.  However, this factor bears less weight for a transformative use, and courts have widely recognized that transformative, critical uses often require using a work in its entirety.  Finally, damage to the potential market for or value of the work based on the use is difficult to infer, and any damage that may occur is not the type the Copyright Act prohibits.  Plaintiff cannot invoke a law meant to prevent the free exploitation of original works, when Defendant has here transformatively used Plaintiff's work to criticize and challenge the factual narrative Plaintiff presents therein.  This factor does not weigh against finding fair use.

I find that the § 107 factors weigh in favor of finding that Defendant's use of the Count

One Video was a fair use.  Furthermore, I find that the facts Plaintiff seeks through further

discovery would not change this analysis or present any "genuine dispute as to any material

fact."  Fed. R. Civ. P. 56(a); *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d at 953; *Hamilton*,

807 F. Supp. 2d at 342.  Even with the evidence Plaintiff seeks, and viewing that potential

evidence in the light most favorable to Plaintiff as the nonmoving party, no reasonable jury could

return a verdict for Plaintiff.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

Therefore, I grant Defendant's motion for summary judgment.  Plaintiff can present no evidence

that Defendant has infringed any copyright protections or interests Plaintiff may possess, and I

will accordingly dismiss Plaintiff's Amended Complaint.

### E.  Defendant's Remaining Arguments

Defendant also argues that Plaintiff has no exclusive rights to the content the Count One

or Count Two Videos.  Defendant claims Smathers obtained the Count One Video through a

FOIA request,[20] and that Defendant obtained the Count Two Video from Chad Jarrett, to whom

Plaintiff gave permission to use his interview and other video clips.  In the alternative, Plaintiff

waived or gave others license to use these videos, Defendant argues, because he gave Jarrett

license to use his interview and presentations in the Count Two Video, and because he may have

---

[20] "Case law analyzing the interaction between the Copyright Act and FOIA exemptions is sparse," and all the case law this Court could find deals only with whether the Copyright Act should prevent disclosure of certain materials under FOIA.  It appears that the United States government and courts reviewing FOIA disclosures conduct analyses under the FOIA exemptions to disclosure, and sometimes account for Copyright Act protections in determining whether releasing material might affect the market in question or constitute fair use.  *See, e.g.*, *Hooker v. U.S. Dep't of Health & Human Servs.*, 887 F. Supp. 2d 40, 61 & n.18 (D.D.C. 2012) (finding plaintiff conceded that defendants properly withheld FOIA-requested documents due to Copyright Act protections, and discussing case law on the intersection of FOIA and the Copyright Act); Renee G. Rabinowitz, *The Applicability of the Freedom of Information Act's Disclosure Requirements to Intellectual Property*, 57 Notre Dame Law. 561, 572–79 (1982) (discussing how courts balance FOIA's disclosure and transparency goals with copyright protections).  Since the fair use analysis disposes of this case and this question remains unsettled, I do not address Defendant's FOIA arguments here.

given the U.S. Government unlimited rights to the Count One Video.  I need not address the Count Two Video, as I have found that Plaintiff failed to satisfy the preconditions to filing a copyright infringement suit based on that video.  I need not address Defendant's remaining arguments concerning the Count One Video, as I have found he has a complete defense to Plaintiff's infringement claim through 17 U.S.C. § 107 and the doctrine of fair use.

### F.  Autry's Request for Attorney's Fees Under 17 U.S.C. § 505

Autry has requested attorney's fees and costs under 17 U.S.C. § 505.  These are awarded at the discretion of the district court, but fees may not be awarded except to the prevailing party. The Fourth Circuit has confirmed that "[p]revailing plaintiffs and prevailing defendants are to be treated alike."  *O'Well Novelty Co. v. Offenbacher, Inc.*, 225 F.3d 655, at *7 (4th Cir. 2000) (citing *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 533–34 (1994)).  "In determining whether to award attorneys' fees to a prevailing party under § 505, a district court should consider the following factors: (1) the motivation of the parties, (2) the objective reasonableness of the legal and factual positions advanced, (3) the need in particular circumstances to advance considerations of compensation and deterrence, and (4) any other relevant factor presented."  *Id.* (citing *Diamond Star Bldg. Corp. v. Freed,* 30 F.3d 503, 505 (4th Cir. 1996)).

I decline to address attorney's fees at this stage.  If, after the filing of this memorandum opinion and order, Defendant wishes to seek attorney's fees under § 505, he should file a motion to that effect, addressing the *Diamond Star* factors and enumerating the attorney's fees and costs he requests.  If he files such a motion, Plaintiff will have fourteen (14) days to respond, and Defendant seven (7) days to reply to that response, before I will consider it.

**V. Conclusion**

For the reasons stated, I will CONSIDER Defendant's Motion (docket no. 28) as a

Motion for summary judgment, and I will GRANT that Motion.  I DENY Defendant's Second

Motion to Supplement the Record (docket no. 63), and I will not consider his motion for

attorney's fees and costs at this time.

It is so ORDERED.

Entered this ___14th___ day of May 2014.



NORMAN K. MOON
UNITED STATES DISTRICT JUDGE