**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| Ergun Caner | : No.: 6:14-cv-4 |
| v. | : Civil Action - Law |
| Jonathan Autry | : (Electronically Filed) |

<u>**Brief in Support of Motion for Fees and Costs**</u>

**I.     This Court should award attorney fees to Jonathan.**

This Court granted summary judgment to Jonathan Autry (hereinafter "Jonathan").[1]  This Court set forth the facts in great detail. *Caner v. Autry*, 2014 U.S. Dist. LEXIS 66508, *2-7 (W.D. Va. May 14, 2014). Caner filed a meritless lawsuit, not to earn a decent wage for his work, but purely to silence critics of his work. A fee award will deter frivolous lawsuits that threaten to stifle criticism, and to reward Jonathan for defending his freedoms under the threat of litigation.

This Court "may allow the recovery of full costs" and "award a reasonable attorney's fee to the prevailing party…" 17 U.S.C.A. § 505. Jonathan has $127.09 in costs for a certificate of good standing, a filing fee for a *pro hac vice* motion, shipping, and PACER. These costs are either awardable under 28 U.S. Code § 1920 or Section 505. For fees, Jonathan prevailed when this Court granted summary judgment. *See Cramer v. Crestar Fin. Corp.*, 1995 U.S. App. LEXIS 25906, *20 (4th Cir. Sept. 13, 1995). In *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994), the Supreme Court adopted an "evenhanded" and "party-neutral" approach to fees. Unlike civil rights actions, "prevailing plaintiffs and prevailing defendants must be treated alike under § 505." *Diamond Star Bldg. v. Freed*, 30 F.3d 503, 505 (4th Cir. 1994). This Court should consider the following factors: (1) "the motivation of the parties," (2) "the objective reasonableness of the legal and factual positions advanced," (3) "'the need in particular circumstances to advance considerations of

---

[1]  Although I do not like to refer to any party by their first name, I do so in this brief simply to avoid confusion as my brother and I share the same last name and I am filing a declaration in support of the motion.

compensation and deterrence,'" and (4) "any other relevant factor presented." *Id.* at 505.[2]

**A.      Caner acted in bad faith and for improper motivation.**

**1.      Caner filed this lawsuit to suppress dissent.**

"[A]ll the evidence proposed and submitted by both parties suggests Plaintiff has filed this suit to suppress legitimate criticism of alleged contradictions in the narrative that supported his rise to prominence." *Autry, 2014* U.S. Dist. LEXIS 66508 at *65. In hypocrisy, Caner extols the virtues of free speech, but seeks to restrict speech directed at him:

> Plaintiff himself has extolled the virtues of these protections and warned against the dangers of censorship and "misinformation": "The one great exponent of America is the freedom to think and rationally believe and reasonably consider for yourself." Mot., Ex. A, Application for Copyright of "Training Session: What You Need to Know About Islam — Base Theater," [hereinafter "Base Theater Application"] at 1, 2. Conveniently, when criticism is directed at him, Plaintiff comes before this Court and argues that it should restrict First Amendment fair use protection to some amorphous group of "qualified" speakers.

*Id.* at *39-40. In line with this double standard, it appears that Caner currently uses the logo of HBO's Game of Thrones series without permission.[3] Apparently, copyright protections—like free speech protections—only matter when Caner is the one benefiting from them.

Caner's filings reveal his motivation to hide the truth. This Court did not receive the copyright applications from Caner, but Jonathan. Further, "Plaintiff's court filings have been noticeably sparse." *Id.* at *33. This Court explained:

> The Amended Complaint is brief, giving very little factual background about the issues in this case. The response on this Motion is two pages long and worded in very general language, completely failing to address most of Defendant's arguments. …

---

[2] This brief does not address the "catch-all" fourth factor because all of the reasons for fees appropriately fit in the first three factors, and Jonathan does not know of any reason to not award fees.
[3] http://fbcjaxwatchdog.blogspot.com/2014/05/ergun-caner-selected-as-camp-pastor-by.html.

> Plaintiff's unusual conduct gives rise to the impression that he seeks to reveal as little as possible to conceal for as long as possible that his claims lack merit.
>
> That impression was corroborated by the conduct of Plaintiff's counsel at the hearing on this Motion, where he finally addressed many of Defendant's arguments. For the first time, without the benefit of written argument for all to see, or of citation (except sometimes to his own beliefs or thoughts) Plaintiff cast aspersions on Defendant's motives and past association with Plaintiff and argued Defendant was not "qualified" under the fair use doctrine to criticize Plaintiff. See Hearing Tr. at 9, 11, 14, 16, 21 Apr. 30, 2014 (docket no. 64) (arguing "I'm not sure Defendant in this case would even be qualified to comment" and attempting to distinguish "cyber terrorism" from "cyber criticism" by defining as "appropriate criticism from people that are qualified to render those opinions i[n] the market place and exchange of ideas in academia and elsewhere," such that "an anonymous cyber terrorist, in my mind, is not entitled to the same Fair Use protection as a publicly identified professional of Atheism," etc.).

*Id.* at *33-35.

This Court and Jonathan had to decipher Caner's positions as if he were an uneducated inmate proceeding *pro se*. To the contrary, Caner is a well-educated university president represented by qualified and capable counsel. Caner's counsel graduated from the esteemed Duke Law School.[4] He was lead counsel for the parents in the infamous Terri Shiavo case, hosts a weekly radio show, and sits as president of the National Center of Life and Liberty.[5]

In spite of this, Caner only cited a single case on fair use and for the first time at oral argument, forcing me to look-up the case on my computer during argument to respond. Caner's tried to throw me off by sandbagging his "authority" and catching me unaware. Fortunately for my brother, I chose to take notes on this particular date with my computer.

---

[4] Although rankings should be taken with a grain of salt, Duke Law School sits at #10 in U.S. News and World Report. http://grad-schools.usnews.rankingsandreviews.com/best-graduate-schools/top-law-schools/duke-university-03117.
[5] http://www.ncll.org/about/david-gibbs-iii-president.

Caner's counsel further threw out new factual arguments for the first time in oral argument, intentionally preventing Jonathan from responding:

> For the first time at the hearing on the Motion, Plaintiff's attorney represented that Defendant once worked for Plaintiff, and is a disgruntled "former employee" who "was fully supportive of [Plaintiff], worked under [Plaintiff] and was terminated and has, we believe, inappropriately attempted to work this copyright issue on Youtube and other places with the purpose of economically hurting [Plaintiff]," by engaging in "cyber terrorism" with a "vindictive and destructive" motivation. See Hearing Tr. at 9, 11, 14, Apr. 30, 2014 (docket no. 64).

*Id.* at *36. I had to bring up Caner's newly-found position with my brother after the hearing—too late to timely respond. In reality, Jonathan never worked as an employee of Caner, and Caner never fired him. *See* Docket #63, Ex. "A". Caner knew this because early in this litigation, Jonathan answered the following informal interrogatory:

> Who was and is your immediate supervisor at LU?
>
> I began posting December 2010, long after I worked at Liberty. I was employed with Liberty twice. I was a sound technician during my undergraduate from the Fall of 99 to the Spring of 03. I do not believe my former supervisors are relevant to your lawsuit.

E-mails, attached as Ex."C".

Caner's counsel also called Jonathan a "cyber-terrorist" on a public record. This hyperbolic rhetoric defies all notions of professionalism, and—although I lack the lengthy career and prestige of opposing counsel—I have never heard an attorney speak in such terms about a party in open court. I say this in spite of the fact that I have represented people accused of murder and sexual assault, but I suppose prosecutors live under ethical guidelines that are unfamiliar to copyright litigators. This conduct was another attempt to distort reality and to keep the eyes of this Court off of Caner's own wrongful conduct through misdirection and trickery.

4

**2.      Caner made it clear in settlement that he only cares about criticism.**

When Jonathan asked Caner to drop the case in exchange for a promise that he would not repost the videos, Caner made clear that his only concern is silencing critics, not any copyright. From the beginning, Jonathan informed Caner that he lacks the money to pay his own attorney, much less Caner's attorney. Docket #28, Ex. "A" ¶31. Jonathan showed commitment to avoid potential copyright issues in the future. Prior to this lawsuit, Caner challenged 34 videos posted by Jonathan, but Jonathan only filed counter-notifications for three. *Id*. at ¶¶27, 29. Jonathan won a challenge, but lost two. *Id.* at ¶29. After Caner sued him for those two videos, Jonathan informed Caner within 48 hours that he removed an additional eight videos that Caner did not challenge and that he would agree to not post any more videos of Caner if Caner would drop this case. *Id.* at ¶32.

Caner showed no concern about his copyright interests, but only for discovering the nature of criticism and the identities of critics and preventing future criticism. Caner asked Jonathan informal interrogatories that focused on the extent of criticism, which Jonathan voluntarily answered. Docket #28, Ex. "A" ¶34; E-mails attached as Ex."C".

Caner demanded that Jonathan never criticize Caner again, which Jonathan expressed that he would agree to. Docket #28, Ex. "A" ¶33. Caner still demanded that Jonathan's wife and three minor children—ages four, five, and seven—agree to never criticize Caner, but Jonathan declined to legally bind his family. *Id.* at ¶35. Caner sought names of other critics and private communications with others about Caner, but Jonathan did not want to give over such private information without a formal request, and thus Caner refused to drop the case. *Id.* at ¶36. Instead, Caner threatened defamation lawsuits with a likely outcome of bankrupting defendants. *Id.* at ¶37.

Not until after transfer to this Court did Caner's counsel drop settlement demands that (1) Jonathan turn over correspondence with and names of other critics, and (2) Jonathan's wife and

5

three minor children sign non-disparagement clauses. Josh Autry Dec. attached as Ex. "A" ¶10. Caner's counsel expressed that Jonathan must agree to never criticize Caner again. *Id.* Caner's counsel would not accept a settlement limited to simply not re-posting the videos. *Id.* Caner's counsel did not even use the word "copyright" in settlement negotiations to my recollection. *Id.* Regardless, Caner never actually made this settlement offer, and Caner's counsel repeatedly emphasized that he had no authority to settle. *Id.* Jonathan demanded approximately $10,000 for my fees to date at the time, which Caner refused. *Id.*[6]

Caner's bizarre behavior in settlement talks show his desire to end criticism and to use this lawsuit as a ruse to get discovery about his critics and to coerce Jonathan into silence. This clear abuse of the litigation process is heavy-handed and in bad faith.

### 3. Caner's dilatory tactics increased the costs of defending this action.

At every turn, Caner acted with complete disregard for Jonathan and this Court. Caner repeatedly delayed the proceedings with little-to-no justification. Caner filed suit 16 months after Jonathan re-posted the Count 1 video, more than two years after he posted the Count 2 video, and more than three years after Jason Smathers originally posted the Count 3 and 4 videos. After filing

---

[6] Jonathan's decisions to reject unreasonable demands and to seek fees are not reasons to deny fees. *Diamond Star* rejected a court's decision to hold a defendant's settlement rejection against it:

> But Sussex had committed no wrong, and Diamond Star's action was frivolous. Accordingly, Sussex was entitled to confront Diamond Star's allegations with a valid defense and should not have been penalized for proceeding to trial and having those allegations declared false.

30 F.3d at 506. Jonathan had every right to seek fees or to reject unreasonable demands. Non-disparagement as a settlement term makes little sense in a case solely about whether posting two videos on YouTube violated an owner's copyright. As the court put it in *Cohen v. Virginia Elec. & Power*, 617 F. Supp. 619, 623 (E.D. Va. 1985) *aff'd in part, appeal dismissed in part*, 788 F.2d 247 (4th Cir. 1986): "Indeed, if there is any difference between the two we must remember that it wasn't the defendant who chose to litigate." Caner forced this litigation with the threat of attorney fees hanging over Jonathan's head and on multiple occasions tried to get wide-ranging censorship through bullying. Jonathan should be rewarded, not punished, for refusing to cower.

suit, Caner waited nearly four months to apply for a copyright on the Count 1 video (a perquisite to filing a lawsuit). Even then, Caner did not apply for a copyright on the Count 2 video in spite of leading court and counsel to believe otherwise—a representation Caner's counsel did not back down from until confronted by this Court at argument last month.

Caner's dilatory conduct and haphazard approach to litigation has often increased the time required to work on the case. Caner initially filed in Texas, a state that lacks jurisdiction over Jonathan even under the loosest understanding of minimum contacts. When informed of this blatant defect, Caner opposed transfer and forced Jonathan to file two motions: a motion to dismiss for lack of jurisdiction and venue, and another motion in the alternative to transfer. Caner waited 41 days after the motions to concede the issue, leading to a transfer to this Court. The improper filing in Northern District of Texas also resulted in an unnecessary *pro hac vice* motion there.

After transfer, Caner received a two week extension for his counsel's *pro hac vice* motion when prompted by a deputy clerk. Docket #45. Five days after the extended deadline, "Plaintiff's counsel averred the documents were in the mail." *Id.* Yet 16 days later, this Court had to order compliance within seven days. *Id.* Caner complied a full four weeks after the original deadline.

When Jonathan sought to stay discovery, Caner all of a sudden claimed a desire to move this case forward with haste. Notably, in the 33 days between the order permitting written discovery requests and this Court's decision granting summary judgment, Caner did not send any discovery requests to Jonathan. Nor did Caner send any formal requests in the 9 ½ months between the filing of the Complaint and the motion to stay discovery. Caner sought and created a false sense of urgency that increased the amount of work related to the motion to stay discovery.

Keeping with his pattern of requiring opposing parties to needlessly brief motions based upon feigned non-concurrence, Smathers filed a similar motion to stay discovery that Caner would not concur in initially, but later agreed to. *See Caner v. Smathers*, No. 4:13-CV-494-Y, Docket No. 50 (N.D. Tex. Feb. 18, 2014) (order granting stay). It is hard to fathom what discovery Caner would need in this case but not in the companion case with nearly identical facts.

At oral argument, Caner sought to delay a ruling, claiming—for the first time—that he needs more discovery to oppose summary judgment. Yet Caner "failed to mention any information he seeks through discovery that might present a dispute of material fact counseling against summary judgment." *Autry*, 2014 U.S. Dist. LEXIS 66508, at *33. When this Court "asked Plaintiff's counsel what issues of material fact might exist in this case, he did not provide a direct answer." *Id.* at n.15. Nor did Caner submit the required Rule 56(d) declaration specifying the discovery needed. By raising the issue at argument, Caner prevented Jonathan from briefing the issue. The alleged need for discovery ultimately rung hollow, and Caner's attempt to catch this Court off-guard fell flat. This Court declined Caner's invitation "to strategically prolong this case through an unsupported request for further discovery." *Id.* at *40-41.

### 4. Courts have found bad faith and improper motivation in similar cases.

This case is like *Religious Tech. Ctr. v. Lerma*, 908 F. Supp. 1362, 1368 (E.D. Va. 1995), where the plaintiff filed a copyright lawsuit to suppress dissent:

> [T]he Court finds that the motivation of plaintiff in filing this lawsuit against The Post is reprehensible. Although the RTC brought the complaint under traditional secular concepts of copyright and trade secret law, it has become clear that a much broader motivation prevailed--the stifling of criticism and dissent of the religious practices of Scientology and the destruction of its opponents.

*Id.* As in *RTC*, Caner brought this case for the sole purpose of suppressing dissent.

8

In *Mattel, Inc. v. Walking Mt. Prods.*, 2004 U.S. Dist. LEXIS 12469, *7 (C.D. Cal. June 21, 2004), another fair use case awarding defense fees, the court considered the plaintiff's sophistication and counsel's competence:

> Plaintiff's conduct also does not appear to be motivated by the protection of a valid interest. Plaintiff had access to sophisticated counsel who could have determined that such a suit was objectively unreasonable and frivolous. Instead, it appears Plaintiff forced Defendant into costly litigation to discourage him from using Barbie's image in his artwork.

*Id*. Like the plaintiff in *Mattel*, Caner is sophisticated (a university president), and his counsel is well-regarded and capable. It is highly unlikely that—given the frivolous nature of the filing—either one of them would have thought this case reasonable.

This case is also like *Bond v. Blum*, 317 F.3d 385, 397 (4th Cir. 2003). In *Bond*, the Fourth Circuit affirmed a fee award where the plaintiff brought a frivolous copyright action to block evidence from his child custody case. The Fourth Circuit summarized the facts:

> [T]he district court found that Bond's motivation in bringing his copyright infringement action was "to block potentially relevant evidence from being presented" in the child custody proceeding. In essence, the court stated that Bond misused the Copyright Act and that he was motivated by a desire to suppress the underlying facts of his copyrighted work rather than to safeguard its creative expression. Assessing the reasonableness of the legal positions advanced by Bond, the court concluded that the fair-use question presented by Bond's complaint was "not a close one" and that Bond's position was "frivolous," although the court recognized that frivolousness was not essential to an award of attorneys fees. The court concluded that it was unreasonable for Bond to use a copyright infringement action to attempt to bar introduction of facts disclosed in the work as admissions against his interest, particularly when the information was relevant to child custody issues. Finally, the court stated that Bond and others in a position similar to him "should be deterred from bringing meritless actions."

*Id*. at 397-98. As in *Bond*, the fair use defense is not a close issue (as explained below), and Caner

filed a frivolous claim for the purpose of suppressing his own words. *See Cramer v. Crestar Fin.*, 1995 U.S. App. LEXIS 25906, at *21 (4th Cir. Sept. 13, 1995) (affirming fees where plaintiff's motivation "questionable" and "significant concerns about … reasonableness and factual bases").

**B.  This case is frivolous.**

For this second factor, "The court may consider, for example, whether the positions advanced by the parties were frivolous, on the one hand, or well-grounded in law and fact, on the other." *Rosciszewski v. Arete Associates*, 1 F.3d 225, 234 (4th Cir. 1993). A finding of bad faith or improper motivation is not necessary if a case is frivolous. *Id.* at 233-34.

**1.  Caner has conceded nearly every single argument by Jonathan.**

This case is wholly lacking in merit. In failing to address the issues in his brief, Caner conceded that (1) Jonathan videos constituted fair use, (2) Caner waived his rights, (3) Jonathan had license to post the videos, (4) Caner had no damages, (5) Caner could not receive attorney fees under Section 412 of the Copyright Act, and (6) Caner could not receive injunctive or declaratory relief because Jonathan will not repost the videos. At oral argument, Caner conceded that he never even applied for copyright on the Count 2 video—a prerequisite to filing a lawsuit.

**2.  All of Caner's positions at oral argument were frivolous.**

Caner's position at oral argument was not only frivolous, but disturbing. At oral argument, Caner's counsel repeatedly made off-the-wall statements on the law and refused to cite legal authority to support his musings. For one thing, Caner's argument that non-academics have fewer rights than their ivory tower counterparts is oddly self-serving. Unimpressed, this Court found:

> Plaintiff's counsel made astounding claims during the hearing that
> discovery would affect the fair use analysis by showing that
> Defendant was not "qualified" to direct "appropriate criticism" at
> Plaintiff, unlike "people that are qualified to render those opinions
> i[n] the market place and exchange of ideas in academia and

> elsewhere," and therefore Defendant could not assert the fair use
> defense. Hearing Tr. at 11, 14, Apr. 30, 2014 (docket no. 64).

*Autry, 2014* U.S. Dist. LEXIS 66508, at *37-38. Ironically, Jonathan's qualifications are a

Master's Degree from the same seminary that Caner presided over.

> This Court found that Caner's "spurious" argument was "ludicrous":

> > Plaintiff's spurious assertion that fair use only applies where a
> > speaker "qualified to render . . . opinions" or to level "appropriate
> > criticism" at a public figure proves ludicrous on its face. Hearing Tr.
> > at 11, 14, Apr. 30, 2014 (docket no. 64). The First Amendment's
> > protections, advanced by the fair use defense, have never applied to
> > some bizarre oligarchy of "qualified" speakers. Excluding speakers
> > who criticize public figures from protection due to the speaker's
> > social status, level of education, or other nebulous "qualifying"
> > factors would nullify the broad protections the First Amendment is
> > meant to provide, and stifle the open discourse that stands against
> > tyranny, intolerance, and oppression.

*Id.* at *39.

> Perhaps to no one's surprise, Caner could cite no authority other than his counsel's beliefs:

> > When pressed at the hearing to provide authority for this
> > counterintuitive proposition, Plaintiff's counsel fell back on his
> > "belie[fs]" and failed to do so. Hearing Tr. at 17-18, Apr. 30, 2014
> > (docket no. 64). As Defendant's counsel aptly observed during the
> > hearing, if Plaintiff's counsel intends to make such outlandish
> > arguments, he should go to the trouble of "typ[ing] out the citations"
> > for any supporting authority. Id. at 24. I doubt such authority exists.

*Id.* at *40. Caner treated argument in this case like a forum on what the law should be in his eyes.

Fortunately for the rest of us, we do not live in *Caner's America*; unfortunately for him, this Court

issued a lengthy opinion highlighting the well-established law that prevents his nuisance lawsuit.

> Likewise, as to Caner's assertion that Jonathan may have been "making money off of this,"

this Court aptly found that a critic's financial gain does not defeat a fair use defense. To hold

otherwise would prevent CNN or any other news organization from receiving First Amendment

11

protection. Academics, including Caner himself, receive the same First Amendment protection and do not sacrifice such protection simply because they receive paychecks.

As usual, Caner provided this Court with no legal authority supporting his position that Jonathan's alleged animus towards Caner would defeat the fair use defense. Such a standard would render the fair use statute a dead letter:

> Many speakers who criticize others using copyrighted works may be motivated to do so based on dislike or distrust of the object of their criticism. If that were a barrier to free speech, fair use would offer little protection, and the analysis would delve courts into a complex and highly subjective inquiry about the motivations and relationships between parties.

*Id.* at \*63-64.

This is not a case where the fair use defense should have come as a surprise. Jonathan's motivation to criticize Caner was clear:

> Clearly, Defendant posted the Count 1 Video for the transformative purpose of criticizing Plaintiff. He provided links to the full Count 1 Video in blog posts that overtly contrasted Plaintiff's statements in the videos with statements Plaintiff had made in other speeches and writings. Mot., Ex. A, Autry Decl. ¶¶23-24. Defendant transformatively used a video of Plaintiff's presentation to the Marines, not to disseminate or profit from its message about Plaintiff's background in Islam, but to "expose" contradictions and "dishonesty" in the testimony of a well-known evangelist and seminary dean. Id. at 21, 22. … As Defendant implies, this criticism lies at the heart of what fair use seeks to protect, in that it targets the allegedly inconsistent statements of a person who has placed himself in the public spotlight through the very narratives now under fire.

*Id.* at \*59-60 (citations omitted).

This is especially true given the Count 2 video. Jonathan took about 28 seconds of audio from the video (Caner's joke about running for President of Egypt), followed by four repeats of a four second audio statement of Caner to Marines that, "I didn't know anything about America until

I was fourteen years old," and concluding with the video of that statement, and another nine second clip from that lecture to Marines. During the audio portions, Jonathan posted text as commentary and criticism. Caner cannot say with a straight face that he did not know that Jonathan is a critic of his. The reality is that Caner brought this action *because* Jonathan is a critic.

Caner also knew that his lecture to the Marines was clearly informational in nature:

> The transcript Plaintiff submitted to the Copyright Office with his application for the Count 1 Video shows his presentation therein was clearly intended to be informational. In the transcript, Plaintiff answers questions about Islam and jihad, and purports to speak about how Muslims abroad view Americans, based on his upbringing in that environment.

*Id.* at *66.

And while the amount of the work used weighs slightly against fair use, Caner should have known that this would not outweigh the other factors. This Court recognized, "Although this factor weighs slightly against fair use, I find it would be senseless to allow Defendant to criticize Plaintiff, but only less effectively, by using portions of the video." *Id.* at *68.

Caner never even alleged market harm. Further, market harm that results from criticism does not weigh against fair use:

> Forceful criticism that has the potential to destroy the market for a copyrighted work does not prevent a finding of fair use. …
>
> Here, Defendant transformatively used a video of Plaintiff's presentation to the Marines to criticize Plaintiff's life story and credentials. This transformative use "renders market substitution less likely and market harm more difficult to infer," mostly because transformative uses are less likely to reside at the core of copyright protection, with thefts of others' original works. Hence, it has long been established that fair use protects the transformative use of a work to criticize, even when the parody or criticism is so forceful that it may eliminate the market for the object of the criticism. To do otherwise would stifle free-flowing debate and criticism in the name of protecting original works and creative labors, taking copyright

13

protections far beyond their intended bounds.

*Id.* at *69-70 (citations omitted). Caner's speculation of market harm does not change the analysis:

> Defendant's biting criticism might suppress demand for Plaintiff's sermons and lectures, and it might well harm, or even destroy the market for Plaintiff and his testimony. But Defendant's use has the potential to suppress demand through forceful criticism *rather than* the potential to usurp demand or profit by using Plaintiff's original work in a similar fashion

*Id.* at *71 (emphasis in original) (citations omitted). To hold otherwise would stifle criticism. Critics often seek the financial demise of their targets. Southern Baptists at one point sought to bring Disney to its knees; the abortion protester hopes to dissuade a doctor's clients from walking in the door. The freedom to criticize dwarfs the target's desire for personal financial gain.

During a 45 minute oral argument, this Court gave Caner's counsel every opportunity to come up with a non-frivolous reason to sustain this case. Caner could not do so. This Court held, "Even considering the evidence Plaintiff seeks in discovery, there is simply no indication Defendant engaged in the type of appropriation the Copyright Act seeks to prevent." *Id.* at *65.

### 3.    Courts have found similar complaints frivolous.

In *Diamond Star*, the Fourth Circuit reversed a decision to not award fees where the copyright action lacked merit, even though there was no evidence of bad faith:

> [W]hen a party has pursued a patently frivolous position, the failure of a district court to award attorney's fees and costs to the prevailing party will, except under the most unusual circumstances, constitute an abuse of discretion.

30 F.3d at 506. Likewise, in *Cohen v. Va. Elec. & Power*, 617 F. Supp. 619, 623 (E.D. Va. 1985) *aff'd in part, appeal dismissed in part*, 788 F.2d 247 (4th Cir. 1986)), a case oft-cited by the Supreme Court in *Fogerty*, the court awarded fees even though the plaintiff acted in good faith because "plaintiff lost and deserved to lose and there is no reason why the discretion of the Court

should not be exercised to award fees in accordance with the provisions of the statute."

In this case, fees are even more appropriate than in *Diamond Star* and *Cohen*. Caner's behavior during this litigation evidences his bad faith and improper motive. The case is patently frivolous. Caner has not in the entire course of this litigation pointed this Court to a single case on fair use that would justify his use of the Copyright Act to hide his own words from public view.

This case is like *Mattel,* 2004 U.S. Dist. LEXIS 12469, at *4, where the court found a defense fee award appropriate in a fair use case, explaining, "The parodic character of Defendant's work was clear, especially in light of the dearth of legal authority Plaintiff proffered to support any argument to the contrary." Like Caner, that plaintiff relied on the amount used factor, but the court rejected the plaintiff's argument as an attempt to limit criticism:

> Plaintiff also asserts that the amount and substantiality of the portion of Barbie that Defendant used was more than required to convey his message. But the Ninth Circuit rebuffed Plaintiff's argument, finding that the claim "is completely without merit and would lead to absurd results." *Mattel*, 353 F.3d at 804. This Court agrees and finds it objectively unreasonable that Plaintiff argued otherwise.

*Id.* at *5-6. The court further found that the plaintiff's sophistication and competent counsel weighed in favor of a fee award:

> Plaintiff's copyright claims were objectively unreasonable. Plaintiff is a sophisticated entity with access to good legal representation. Plaintiff's claims were not in an unsettled area of law and had little likelihood of success. Plaintiff's copyright claims, therefore, were frivolous.
>
> Plaintiff's conduct also does not appear to be motivated by the protection of a valid interest. Plaintiff had access to sophisticated counsel who could have determined that such a suit was objectively unreasonable and frivolous. Instead, it appears Plaintiff forced Defendant into costly litigation to discourage him from using Barbie's image in his artwork.
>
> As to the factors of compensation and deterrence, Mattel (a large

15

> corporation) brought objectively unreasonable copyright claims
> against an individual artist. This is just the sort of situation in which
> this Court should award attorneys fees to deter this type of litigation
> which contravenes the intent of the Copyright Act.

*Id.* at *7. Caner is well-educated and represented by competent counsel. Although Caner's briefs filed in this case to-date have been slim, I have good reason to suspect that the next one will be a little thicker. Caner's counsel will prove his legal capabilities in his response to this motion. In the Texas case, Caner filed his first brief of any substance just last week in order to oppose fees.

Caner will likely argue that his complaint was not frivolous on its face, but that is not the standard. In *Stern v. Does*, 2011 U.S. Dist. LEXIS 37735, *40-49 & n.13 (C.D. Cal. Feb. 10, 2011), *affirmed*, 512 Fed. Appx. 701, 703 (9th Cir. Cal. 2013), the court found a fee award proper where the plaintiff's copyright claim was objectively reasonable on its face, but the defendant had an "obvious" fair use defense, the plaintiff could not seek statutory damages or attorney fees due to Section 412, the plaintiff did not prove any damages, and the plaintiff could not demonstrate need for an injunction. As in *Stern*, Caner faced an obvious fair use defense and has conceded that he could not receive any relief whatsoever under the Copyright Act.[7]

## C.   Fees will deter censorship-focused plaintiffs and encourage free speech.

In general, defense fees help deter frivolous litigation. In *Diamond Star*, the Fourth Circuit recognized that "the goal of deterring a party from pursuing frivolous litigation is furthered by the imposition of attorney's fees and costs here." 30 F.3d at 506. But, even where litigation is not frivolous, defense fees make more sense in fair use cases than in other cases.

---

[7] Although Section 412 of the Copyright Act would have barred a fee award to Caner, it is no bar to defense fees:

> [B]y its plain language, § 412 only applies to plaintiffs who assert copyright
> infringement claims and not to defendants who successfully defend against such
> claims. 4 Finally, it simply defies logic to conclude that an unsuccessful plaintiff's
> additional failure timely to register its copyright serves to bar a court from
> awarding attorneys' fees to the prevailing defendant.

*O'Well Novelty v. Offenbacher, Inc.*, 2000 U.S. App. LEXIS 18526, *24 (4th Cir. 2000) (affirming defense fees).

The Ninth Circuit has recognized the importance of awarding defense fees in fair use cases:

> [L]awsuits of this nature . . . have a chilling effect on creativity insofar as they discourage the fair use of existing works in the creation of new ones. The fair use doctrine is an integral part of copyright law precisely because it gives authors "breathing space within the confines of copyright" to build upon their predecessors' works. *Campbell*, 510 U.S. at 579. When a fee award encourages a defendant to litigate a meritorious fair use claim against an unreasonable claim of infringement, the policies of the Copyright Act are served.

*Sofa Entm't. v. Dodger Prods.*, 709 F.3d 1273, 1280 (9th Cir. 2013). Fees in fair use cases serve a dual purpose: to deter nonsense suits and to encourage litigation of fair use defenses.

Frivolous copyright actions in the fair use context threaten to chill criticism. That was precisely Caner's goal. If successful, Caner would be able to remove works from the public eye (his and Jonathan's). The Copyright Act seeks the opposite: to facilitates the creation of works and permits others through fair use to build off of and respond to those works.

Caner needs deterrence as well. He is likely to file other lawsuits. He has already sued two people in this case alone. Further, he threatened Jonathan with filing a series of defamation lawsuits with the likely result of bankrupting the defendants. Docket #28, Ex. "A" ¶37.

This Court should reward Jonathan for not buckling under the pressure and for litigating a valid fair use defense. Like a civil rights victory, a fair use victory protects the speech rights of all. In the world of the internet, courts rely on one another from across jurisdictions from coast-to-coast more than ever. In addition, religious media and bloggers have followed this case. Fees send a signal to encourage free speech by the little guy in the face of litigation.

If Jonathan rolled over and took a default judgment, not only would Caner have sought a fee award of his own that Jonathan could ill-afford to pay, but Caner may have used the litigation as support and motivation for lawsuits against other critics. Defense fees, however, will deter

Caner and others like him from filing copyright actions to hide their words. Could George Allen sue the person who posted the infamous "macaca" video on YouTube without his permission? Could Howard Dean sue anyone who published his "scream heard around the world" without obtaining his permission in advance? I'm sure there's some videos that Rob Ford would like to purge from the internet as well that were presumably posted without first obtaining his written consent. This Court should encourage defendants to litigate fair use defenses while at the same time discouraging public figures from using the Copyright Act as a ploy to hide their words.

　　　　Fees also encourage the creation of critical works in the first place:

> Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement.

*Fogerty*, 510 U.S. at 527. The Copyright Act ensures that the public sphere can access works:

> The limited scope of the copyright holder's statutory monopoly . . . reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.

*Id.* at 526 (quoting *Twentieth Century Music v. Aiken*, 422 U.S. 151, 156 (1975)). The ability to build off another's work is the primary purpose of the act, *not* the reward to the original author:

> The primary objective of copyright is not to reward the labor of authors, but 'to promote the Progress of Science and useful Arts.' To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work.

*Id.* at 527 (quoting *Feist Publications v. Rural Telephone Service*, 499 U.S. 340, 349-350 (1991)).

　　　　Caner does not even seek reward for his labor. He does not wish to market the lectures, but

18

simply to hide them. In doing so, Caner directly attacks the primary purpose of "enriching the

general public through access" to his work. If there ever is a case for encouraging a defense, it is

when the plaintiff challenges the ultimate purpose of the Copyright Act head-on.

For this reason, a court in a similar case found defense fees appropriate:

> Such uses of copyright litigation directly threaten the purposes of
> the Copyright Act, by chilling the creation and dissemination of
> creative critical works. If plaintiff believed that the Documentary
> was inaccurate, disrespectful, or otherwise unfair with respect to her
> late husband, her remedy is to create additional works refuting the
> Documentary, not to engage in a pattern of private censorship
> through frivolous assertion of unrelated copyright claims.

*Hofheinz v. AMC Prods.*, 2003 U.S. Dist. LEXIS 16940, *18 (E.D.N.Y. Sept. 1, 2003), *aff'd*, 2002

U.S. App. LEXIS 13562 (2d Cir. May 20, 2002). That plaintiff made similar spurious arguments:

> She asserted irreparable harm in arguing for provisional remedies
> even while she stated her desire to arrive at a financial settlement.
> She alleged infringement even though she had granted a license for
> cable exhibition of many of the allegedly infringed works. Her
> arguments on the fair use factors were largely spurious. In
> particular, her argument that the existence of a market for film clips
> supported her claim that the Documentary harmed the market for
> her copyrighted works was rejected by three district courts,
> including this Court, as circular. Furthermore, her argument, raised
> on summary judgment and again in opposition to the present
> motion, that the Documentary cannot be considered "scholarly"
> because it contains factual errors, is simplistic at best and, if
> approved, would severely chill nearly all works of scholarship or
> criticism, not to mention the fact that the argument has nothing
> whatever to do with the Documentary's use of her copyrighted
> works. In short, plaintiff's arguments throughout this litigation have
> been largely frivolous and objectively unreasonable. This is not a
> close case, and since encouraging copyright holders to litigate
> claims of this sort would negatively impact the creation of new
> works of commentary and criticism, such claims are appropriately
> deterred by assessment of attorneys fees. Conversely, encouraging
> the creators of works of commentary and criticism to litigate the fair
> use defense in cases of this sort by compensating them for their legal
> expenses will enrich the public by increasing the supply and
> improving the content of commentary and criticism.

*Id.* at *19-20.

As in that case, Caner gave license to use the works (conceded), has no right to any remedy (conceded), suffered no market harm (conceded), and made spurious arguments in response to fair use (at oral argument after conceding the issue by omission in his brief). Interestingly, Caner—like the *Hofheinz* plaintiff—questioned whether his critic is "scholarly" enough, a dangerous limitation to suggest. If Caner believes criticisms of him are inaccurate, he should respond with additional works to redeem himself and to expose his critics as mistaken. This Court should deter him from using the court system as a vehicle to steamroll his opponents with baseless copyright claims.

Likewise, the disparity between the parties justifies a fee award. In *Fogerty*, 510 U.S. at 524, the Supreme Court contrasted civil rights actions where, "oftentimes … impecunious 'private attorney general' plaintiffs can ill afford to litigate their claims against defendants with more resources." Whereas, in copyright cases, "plaintiffs can run the gamut from corporate behemoths to starving artists; the same is true of prospective copyright infringement defendants." *Id.* (citing *Cohen*, 617 F. Supp. at 622-23). In *Cohen*, the Eastern District explained:

> Copyright laws are not intended for the benefit of prospective plaintiffs. Who may be a plaintiff and who may be a defendant doesn't define the difference between good guys and bad guys. Nor can we assume that plaintiffs are inherently impecunious while defendants have deep pockets.

*Id.* at 622.

This case highlights such a disparity: a college president sued a defendant and former student of limited means. Notsurprisingly, Caner chose not to sue the United States government for releasing the video in the first place to Jason Smathers. Instead, Caner kept his targets small, perhaps hoping that his defendants would not litigate at all due to their limited means.

In *Mattel*, the court explained:

20

> As to the factors of compensation and deterrence, Mattel (a large corporation) brought objectively unreasonable copyright claims against an individual artist. This is just the sort of situation in which this Court should award attorneys fees to deter this type of litigation which contravenes the intent of the Copyright Act.

2004 U.S. Dist. LEXIS 12469, at*7. Caner is a university president. Jonathan, on the other hand, was unemployed during part of this litigation and, although employed now, is currently an Adult Day Service Aid. Josh Autry Declaration, attached as Ex. "A" ¶8. This case is more akin to the indigent litigant suing the government to vindicate a constitutional violation than the case of two record companies fighting over royalties. Fees would promote new critical works like Jonathan's.[8]

**D.**   **The amount and rate of fees is reasonable.**

This Court has set forth the applicable standard in numerous cases:

> The determination of whether a requested fee is reasonable begins with the lodestar formula--the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998). The lodestar figure is presumed reasonable, *Blum v. Stenson*, 465 U.S. 886, 897, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984), but may be adjusted upward or downward after consideration of (1) the time and labor required to litigate the suit; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform properly the legal service; (4) the attorney's opportunity cost in accepting the case; (5) the customary fee for such work; (6) the attorney's expectations at the outset of litigation; (7) any time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship between attorney and client; and (12) fee awards in similar cases, *Brodziak*, 145 F.3d at 196 (quotation and citation omitted).
>
> The reasonable hourly rate is based upon the prevailing market rate of lawyers of comparable skill, experience, and reputation in the

---

[8]   Caner recently claimed in the Northern District of Texas that he cannot pay a fee award. Although questionable, Caner's "allegations of poverty do not reduce the costs of this litigation that could have been avoided but for the unreasonable positions [he] has taken." *Silver Ring Splint v. Digisplint* 567 F. Supp. 2d 847, 858 (W.D. Va. 2008).

relevant community. *Blum*, 465 U.S. at 895; *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994).

*Travis v. Prime Lending*, 2008 U.S. Dist. LEXIS 46058, at *10-11 (W.D. Va. June 12, 2008).

"[P]aralegal fees … are compensable under fee shifting statutes because the use of paralegals helps

reduce the expense of litigation." *Id.* at n.3 (citing *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989)).

This Court surveyed its cases in 2007 and determined that a reasonable hourly rate is $250

per hour. *Miller v. Pilgrim's Pride Corp.*, 2007 U.S. Dist. LEXIS 64653, at *22-23 (W.D. Va. Aug.

31, 2007). This Court later relied on the *Miller* survey in finding $250 a reasonable hourly rate

where a party failed to supply any evidence in support of the rate. *Duncan v. GE Consumer Fin.,

Inc.*, 2007 U.S. Dist. LEXIS 81797, at *6 (W.D. Va. Nov. 5, 2007) (also approving $75 for

paralegal). A survey of cases since then confirms that $250 is at or below a reasonable rate for

attorneys and $75 is at or below a reasonable rate for paralegals. *Hummel v. Hall*, 2012 U.S. Dist.

LEXIS 99370 n.4 (W.D. Va. July 18, 2012) ($290); *Kindred v. McLeod*, 2010 U.S. Dist. LEXIS

123116, n. 14 (W.D. Va. Nov. 19, 2010) ($225 and $350); *Travis*, 2008 U.S. Dist. LEXIS 46058,

at *11-12 ($250 for attorney and $75 for paralegal). I request $250 for my time and $75 for my

paralegal. I have attached declarations (Ex. "D" & "E") from a local attorney and an attorney in the

Northern District of Texas in support. *See Smith v. Tarrant County College Dist.*, 2010 U.S. Dist.

LEXIS 108973, n.9 & *25 (N.D. Tex. Oct. 13, 2010) (rates of up to $400 in Dallas/Fort Worth).

Jonathan seeks 115.5 hours for my time, or $28,257.50 at a $250 rate, and 12.4 paralegal

hours, or $930 at a rate of $75. After adding $127.09 for costs, he seeks $29,314.59 in total.

**1.** The hours put into this litigation were reasonable. Caner has made this case

unnecessarily time consuming. Josh Autry Declaration, attached as Ex. "A" ¶9. Caner forced me to

get admitted in the Northern District of Texas *pro hac vice* by filing in a state without jurisdiction

or venue. *Id.* Then Caner forced me to research and brief a motion to dismiss for lack of venue or jurisdiction and a motion to transfer with a supporting brief due to the fact that he initially opposed transfer. *Id.* On top of that, Caner opposed postponing discovery for apparently no reason other than to force me to brief the issue. *Id.*

The dispositive motion involved a plethora of issues, including standing to sue, fair use, license, waiver, damages, attorney fees, and an injunction. *Id.* at ¶11. The hours expended were necessary. *Id.* On the other side of a dispositive motion, a defendant does not know for certain whether a court will agree even if the defendant believes a case is frivolous. *Id.* I needed to provide full representation. *Id.* I found legitimate and strong caselaw in support of each defense.

I chose to save time by not re-doing my research after the switch to the Fourth Circuit and seeking to file a supplemental brief with Fourth Circuit caselaw. *Id.* at ¶12. While such research would have aided the court, as counsel, I had to make tough decisions about the amount of work on this case. *Id.* After reviewing this Court's lengthy decision, I feel that I did not put *enough* hours into researching the issues. *Id.* Likewise, I saved time by requesting that oral argument and the conference with Magistrate Ballou be held by phone conference. *Id.* at ¶13. If I had to drive to Lynchburg for each event, there would have been eight hours of round trip travel. *Id.* For this very reason, I sought to stay discovery. *Id.* Not only did I have reason to believe that Caner would seek overly broad and harassing discovery that would create mini-litigation in and of itself, but discovery is time-consuming. *Id.* In an effort to keep hours down in this case, I sought to postpone discovery and chose not to send requests until after this Court's ruling. *Id.*

Finally, the hours submitted to not include any time before the filing of the Amended Complaint. *Id.* at ¶14. I did not keep track of my hours before that point because I was hopeful that

23

Caner would drop this baseless case. *Id.* For this reason, the time submitted does not include review of the original Complaint last June, settlement discussions in June and July, interviewing my brother in preparation of a defense in June and July, preliminary research into the claims, and anything else I did on the case before mid-October. *Id.*

**2.** I doubt the issues are novel or difficult to a copyright attorney, but they were new to me. I had never handled a copyright case before and have not since. *Id.* at ¶5. I found the answers to be clear, but I still had to do the research to find the caselaw and support the defenses.

**3.** I believe this case does require federal litigation experience, which I fortunately do have. I have handled federal litigation consistently since becoming an attorney in 2008. *Id.* at ¶5. My federal litigation experience has been primarily with civil rights litigation, but has included criminal defense and personal injury litigation as well. *Id.*

**4.** I took the case as an associate. *Id.* at ¶6. At both my prior and current firms, partners agreed to let me take the case because of its frivolous nature and due to the expectation of fees given even-handed fee-shifting statute. *Id.* My time on the case has caused a trade-off, with each hour preventing me from working on other work. *Id.* At my prior firm, my time resulted in less work on both contingency fee cases and hourly retainer cases. *Id.* At my current firm, each hour is an hour I cannot spend on an hourly retainer case. *Id.*

**5.** As explained above, $250 is a reasonable fee in this Court.

**6.** As explained above, both my firms and I have anticipated a fee award from the outset.

**7.** I am unaware of any time limitations imposed by Jonathan or other circumstances.

**8.** The amount in controversy is Jonathan's exposure. That is whatever fees Caner's attorney would charge during the course of the litigation and through trial and a possible appeal.

While I do not believe Caner is eligible for fees under Section 412 of the Copyright Act, that is the threat looming over my brother's head. The result obtained is complete victory in both this case and the companion case based upon the motion and brief I was primarily responsible for preparing.

**9.** I have attached an updated resume. Josh Autry Resume, attached as Ex."B". As explained above, this is my first and to-date only copyright case. Josh Autry Declaration, attached as Ex. "A" ¶5. I have handled numerous First Amendment cases and there is a strong First Amendment component in the fair use doctrine. *Id.* I have had considerable litigation experience in federal courts. *Id.* Although this case did not get to trial, that is always a risk. I have been fortunate enough to handle 15 trials, sitting as first chair in 11. *Id.* If this case ended up on appeal, I have handled numerous appeals and have a few published appellate victories. *Id.*

**10.** This case was undesirable because my brother could not pay fees.

**11.** This factor is interesting because my relationship with my brother is as old as I am (30 years), but my representation of him as a client began in June of last year.

**12.** I have not found a fee award in a similar case in this district.

### III.   Conclusion

Jonathan requests this Honorable Court award him $29,314.59 for fees and costs.

Respectfully Submitted,

By:    _/s/ Joshua M. Autry_____
Joshua M. Autry, Esquire
Pa. Supreme Ct. I.D. 208459
Lavery Faherty Patterson
225 Market St, Suite 304
Harrisburg, PA 17108
Phone: (717) 233-6633
Fax: (717) 233-7003
jautry@laverylaw.com

Dated: May 28, 2014

25

**CERTIFICATE OF SERVICE**

I hereby certify that on the date listed below I electronically filed the foregoing with the Court using the CM/ECF system, which sent notification of such filing to the following person(s) at the following email address(es):

David C. Gibbs
dgibbs@gibbsfirm.com


/s/ Joshua M. Autry_____
Joshua M. Autry, Esquire


Dated: May 28, 2014