IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| Ergun M. Caner, | : | No.: 6:14-cv-004 |
| Plaintiff | : | |
| v. | : | Civil Action - Law |
| | : | Jury Trial Demanded |
| Jonathan Autry, | : | (Electronically Filed) |
| Defendant | : | |

**<u>Reply Brief in Support of Motion for Fees and Costs</u>**

**I.      This Court should award fees for this Reply.**

I have spent 20.3 hours on this reply brief, as explained in my second declaration and updated spreadsheet (attached as Exhibits G & H). This time is reasonable and necessary. I had to draft this brief, review and analyze the cases cited by Caner, and research an issue raised by Caner in his response brief (whether this Court should deny or reduce fees due to my *pro bono* representation). The law is clear that Caner's argument is incorrect, but I had to research those cases to draft the section in this brief in order to aid the Court.

Jonathan initially sought 115.5 hours for my time, or $28,257.50 at a $250 rate, and 12.4 paralegal hours, or $930 at a rate of $75, and $127.09 for costs, for a total request of $29,314.59 in total. Now, adding my additional hours, he seeks 135.8 hours for my time, or $33,332.50, for a total request of $34,389.59 after adding the previous paralegal time and hours.

**II.     Caner will not stop acting in bad faith.**

**A.      <u>Caner repeatedly misleads the Court about the Count 2 video.</u>**

Caner still to this day argues as if this Court knows nothing of the Count 2 video, which only used a minor snippet of Caner's presentation. Throughout his brief, Caner argues that both videos were "lengthy" and used his "entire works." It's about time for Caner to start being honest

1

with this Court, this country, and himself.

As this Court knows, Jonathan Autry ("Jonathan")[1] compiled the Count 2 video with a audio clip pulled from *Go Chad Live*, a video blog ("vlog") by one of Caner's supporters, and some clips from the Marine lectures. Jon Autry Dec. ¶¶12-13 (Docket #28, Ex. "A"). Jonathan took 28 seconds of audio from the vlog (Caner's joke about running for President of Egypt), followed by repeating a four second audio statement of Caner to Marines that, "I didn't know anything about America until I was fourteen years old," and concluding with the video of that statement and another nine second clip from that lecture to Marines. *Id.* ¶14. During the audio portions, Jonathan posted text as commentary and criticism. *Id.* ¶14. The total Count 2 video is about one minute and fifteen seconds and by no means "lengthy." *Id.* ¶16.

Caner argues that Jonathan reproduced this video without his permissions, but Caner's supporter gave Jonathan express permission to do so. *Id.* ¶17. Nor can Caner deny his supporter's license and permission to post the video as Caner states to the camera, "I am Ergun Caner, and you are watching *Go Chad Live*." *Id.* ¶13.

Finally, Caner argues that he applied for a copyright on this video—after confessing otherwise to this Court at oral argument. In finding bad faith, this Court should consider Caner's nonchalant and consistent practice of dishonesty.

### B.  <u>Caner misleads this Court once again about his knowledge of Jonathan.</u>

Caner has repeatedly "hid the ball" in this litigation and—even at oral argument—would dodge questions and only give this Court cryptic innuendos into what discovery he needed and his legal positions. Caner's decision in this litigation to wait until oral argument to make his legal

---

[1] As in the opening brief, I use Jonathan's first name simply because both of us have submitted affidavits subject to this motion and to avoid confusion from our shared last name.

and factual contentions known evidences his bad faith. Caner apparently concedes that he falsely told this Court through counsel that Jonathan is a former employee of his. Remarkably, Caner in his brief makes a misstatement in the polar opposite direction: that he's never even met Jonathan. Response Brief p. 5 ("Dr. Caner has had no prior knowledge or relationship with Mr. Autry…"). To put it lightly, this Court should take everything the man says with a grain of salt.

**III.    Caner does not give this Court any reason to ignore his bad faith to-date.**

        **A.    <u>Caner's pleadings and arguments show his dual improper motives: to remove his works from view and to suppress criticism.</u>**

Caner ignores this Court's summary finding that he "filed this suit to suppress legitimate criticism of alleged contradictions in the narrative that supported his rise to prominence." *Caner v. Autry*, 2014 U.S. Dist. LEXIS 66508, *65 (W.D. Va. May 14, 2014). Caner argues that he sought to remove the videos from public view because he frequently lectures on the topics in the videos. But Caner does not argue that less people attend his lectures because these videos are available online. Caner has conceded since the beginning of this litigation that he has suffered no market harm whatsoever.

Caner argues that, as proof that he does not seek to suppress criticism, he has not "gone on a crusade to remove all videos of himself from the Internet…" But Caner *has* used accused bloggers of copyright violations to pressure them to remove his misstatements from the web.[2] Caner challenged almost three dozen videos posted by Jonathan alone with YouTube. Jonathan Dec. ¶27 (Docket #28, Ex. "A"). Caner's asserted narrow focus on the two videos at issue in this case is a farce.

---

[2] "Liberty U. removing Ergun Caner as seminary dean over contradictory statements," *The Washington Post*, June 30, 2010 (http://www.washingtonpost.com/wp-dyn/content/article/2010/06/29/AR2010062905331.html?nav=hcmodule) (accessed 6/16/2014).

Caner's selectivity shows his bad faith as well. Caner chose small targets who are (1) unable to afford to defend complex federal litigation, and (2) critics of him. Caner went after the videos with his most egregious misstatements in an attempt to scrub the internet. Caner is precisely the kind of plaintiff in need of some "strong medicine," as he puts it. Response Br. p. 10.

Caner's hyperbolic rhetoric towards Jonathan further shows his desire to distract this Court from his own wrongdoing. Whether or not Caner used such name calling on a public record to "vex" Jonathan this Court may never know, but this Court can know from Caner's actions that he brought this case to suppress valid criticism and to purge his false statements from public view. Neither purpose is legitimate.

**B.** **Caner's out of court conduct shows his primary focus on criticism.**

Caner now claims that in settlement he only sought to ensure that Jonathan did not repost the videos. To the contrary, Caner always required as a condition of settlement that Jonathan agree to never criticize Caner again for the rest of his life, a fact Caner concedes. Caner further concedes that (1) Jonathan removed an additional eight videos that Caner did not even challenge and agreed to never post any videos of Caner again if Caner would drop the suit—by day 2 of Caner's 120 day period of mulling over his options, and (2) Caner threatened defamation lawsuits with a likely outcome of bankrupting defendants. Caner's demands show his true motive: to pressure a critic into permanent silence with the threat of Caner's legal fees as the stick.

**C.** **Caner fails to distinguish cases finding bad faith where plaintiffs did not seek to market their works.**

Caner distinguishes *Religious Tech. Ctr. v. Lerma*, 908 F. Supp. 1362, 1368 (E.D. Va.

4

1995), because of the *de minimis* reproduction in that case, because of comments by the plaintiff of his intent to harass and discourage, and because the defendant was a public media outlet. As to the amount of work used, Caner wants this Court to forget that the Count 2 video did not use much of his work. More importantly, Caner's lawsuit is frivolous not because of the amount used, but because of the obvious fair use defense with Jonathan's clear purpose in posting the videos to expose Caner's falsehoods. The Count 2 video made Jonathan's criticism crystal clear, as did Jonathan's blog posts.[3] As in *RTC,* Caner has shown his "reprehensible" purpose of squelching Jonathan's criticism with the threat of bankrupting him. As to the defendant being a media outlet, bloggers carry the same rights as salaried news reporters, and (as usual) Caner does not cite any contrary authority.

Caner considers it "an odd stretch" from *Mattel, Inc. v. Walking Mt. Prods.*, 2004 U.S. Dist. LEXIS 12469 (C.D. Cal. June 21, 2004), to expect that he, a sophisticated party represented by competent counsel, know that a case is baseless. But the sophistication of the plaintiff was a consistent theme in *Mattel.* Caner and counsel apparently took 120 days to "explore[] his legal options" between the filing of the Complaint and Amended Complaint. Response Br. p. 9. It is no stretch of this Court's imagination to assume that they knew the unreasonableness of a potential lawsuit brought for the purpose of hiding a public figure's words. In all likelihood, they simply expected to win due to anticipated indigent *pro se* defendants.

Caner argues that, unlike the plaintiff in *Bond v. Blum*, 317 F.3d 385, 397-98 (4th Cir.

---

[3] *See, e.g.,* "My Thesis," Jan. 31, 2013 (http://mosesmodel.tumblr.com/post/41107594852/my-thesis) (accessed 10/27/2013); "Ergun Caner 7 minutes 30 seconds," Sept. 21, 2011 (http://stoneoforthanc.blogspot.com/2011/09/ergun-caner-7-minutes-30-seconds.html) (accessed 10/27/2013); "Ergun Caner, part of the problem," Sept. 2, 2011 (http://stoneoforthanc.blogspot.com/2011/09/ergun-caner-part-of-problem.html) (accessed 10/27/2013).

2003), he has not sought to suppress evidence in a court case. But Caner, like the *Bond* plaintiff, did not bring a copyright action for any purpose supported by the Act. Instead, he sought to hide his works from public view to prevent his critics from using them to expose him as a fraud. *See also Cramer v. Crestar Fin.*, 1995 U.S. App. LEXIS 25906, at *21 (4th Cir. Sept. 13, 1995) (fees where plaintiff's motivation "questionable" and "significant concerns about … reasonableness and factual bases").

**IV.    At no point does Caner show legal support for his lawsuit.**

      **A.    <u>Caner again concedes nearly every argument.</u>**

As the Fourth Circuit has held, a finding of bad faith or improper motivation is not necessary if a case is frivolous. *Diamond Star Bldg. v. Freed*, 30 F.3d 503, 506 (4th Cir. 1994); *Rosciszewski v. Arete Associates*, 1 F.3d 225, 233-34 (4th Cir. 1993). But this case is frivolous. By failing to address the issues in yet another brief, Caner concedes that (1) Caner never applied for a copyright on the Count 2 video (a prerequisite to filing suit), (2) both videos constituted fair use, (3) Caner waived his rights, (4) Jonathan had license to post the videos, (5) Caner had no damages, (6) Caner could not receive attorney fees under Section 412 of the Copyright Act, and (7) Caner could not receive injunctive or declaratory relief because Jonathan will not repost the videos.[4]

      **B.    <u>Caner ignores this Court's holding on the merits.</u>**

Caner does not defend his untenable positions at oral argument, such as restricting criticism rights to academics like himself. This Court referred to his proposed qualification

---

[4] Caner appears to argue that the case is not frivolous simply because he followed the procedures under the Digital Millennium Copyright Act (DMCA). Response Br. p. 8-9. It is hard to understand how this would justify excusing his bad faith and frivolous positions on the merits. If anything, each DMCA procedural step gave Caner another opportunity to reflect on his case and all of the reasons to not move forward.

standard as "astounding," "spurious," "bizarre," "nebulous," "ludicrous," and "counterintuitive." *Autry, 2014* U.S. Dist. LEXIS 66508, at *37-40. Nor does Caner attempt to defend his prior arguments that Jonathan would lose fair use protection if he made money off of the criticism (as most media outlets do) and if he sought Caner's demise (as critics often do).

Caner focuses on the portion used, but he ignores this Court's holding that "it would be senseless to allow Defendant to criticize Plaintiff, but only less effectively, by using portions of the video." *Id.* at *68. He also ignores the *de minimis* amount used in the Count 2 video.

> ### C.       Caner fails to distinguish cases awarding defense fees due to obvious fair use defenses.

Caner does not attempt to distinguish *Hofheinz v. AMC Prods.*, 2003 U.S. Dist. LEXIS 16940, *18-20 (E.D.N.Y. Sept. 1, 2003), *aff'd*, 2002 U.S. App. LEXIS 13562 (2d Cir. May 20, 2002), where the plaintiff made "spurious" objections to a fair use defense, including that the defendant was not "scholarly" enough to criticize her, or *Stern v. Does*, 2011 U.S. Dist. LEXIS 37735, *40-49 & n.13 (C.D. Cal. Feb. 10, 2011), *aff'd*, 512 Fed. Appx. 701, 703 (9th Cir. Cal. 2013), where the defendant had an "obvious" fair use defense, the plaintiff could not seek statutory damages or attorney fees due to Section 412, the plaintiff did not prove any damages, and the plaintiff could not demonstrate need for an injunction. Caner attempts to argue that *Mattel,* 2004 U.S. Dist. LEXIS 12469, at *4-6, is inapplicable, but that case found—as here— that the plaintiff should have known about the clear fair use defense and that the amount used would not outweigh the other factors.

Every case Caner cites—none of which involved fair use—relied on findings that the plaintiffs acted both reasonably and in good faith: *Virgin Records Am. v. Thompson*, 512 F.3d 724, 727 (5th Cir. 2008); *Positive Black Talk v. Cash Money Records*, 394 F.3d 357, 381-382

(5th Cir. 2004); *Creations Unlimited v. McCain*, 889 F. Supp. 952, 954-955 (S.D. Miss. 1995), *aff'd*, 112 F.3d 814, 817 (5th Cir. 1997),[5] *Charles W. Ross Builder v. Olsen Fine Home Bldg.*, 2012 U.S. Dist. LEXIS 2194, at *8-13 (E.D. Va. Jan. 9, 2012). In fact, the *PBT* case went to trial where a renowned music industry expert supported the plaintiff's position. 394 F.3d at 381-382.

In *CWR*, the district court's original decision granting judgment to the defendant was reversed. *See Charles W. Ross Builder v. Olsen Fine Home Bldg.*, 496 Fed. Appx. 314 (4th Cir. Va. 2012). Although the defendant ultimately prevailed on remand, the plaintiff's successful appeal highlights its reasonableness. *Charles W. Ross Builder v. Olsen Fine Home Bldg.*, 2014 U.S. Dist. LEXIS 36268, 9-15 (E.D. Va. Mar. 18, 2014) (denying fees on remand). The court rejected the plaintiff's argument of inability to pay as weighing against a fee award because "it is also inescapably true that Charles Ross was the party who chose to risk litigation despite the thin protection granted by its copyright of a Georgian-style home design." 2014 U.S. Dist. LEXIS 36268, at *17. But the court found that the defendant's financial hardship could not outweigh the other factors, primarily the plaintiff's reasonableness. 2014 U.S. Dist. LEXIS 36268, at *17-18; 2012 U.S. Dist. LEXIS 2194, at *15. However, the court did award defense fees for the frivolous DMCA claim. 2014 U.S. Dist. LEXIS 36268, at *18-20; 2012 U.S. Dist. LEXIS 2194, at *3-6.

**V.    Caner does not show any reason to deny fees in fair use cases.**

Attempting to show a need for judicial reluctance to grant fees in fair use cases, Caner argues that the fair use question is really, really hard to understand, citing *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 476 (1984), and *Triangle Pub. v. Knight-Ridder Newspapers*, 626 F.2d 1171, 1174 (5th Cir. 1980). Neither case supports his position.

---

[5] Caner actually cites to the Fifth Circuit decision, but the Fifth Circuit decision does not explain why the district court denied fees.

*Sony* highlights the baseless nature of his complaint. In *Sony*, TV networks argued that a company selling a video tape recorder (VTR), a predecessor to the VCR, permitted viewers to watch shows after the fact and fast-forward through commercials. The Supreme Court began its analysis by explaining that copyright protections exist to benefit the public, not the monopoly holder:

> The monopoly privileges that Congress may authorize are neither unlimited nor primarily designed to provide a special private benefit. Rather, the limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.
>
> The copyright law, like the patent statutes, makes reward to the owner a secondary consideration. … The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors. It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius.

464 U.S. at 429 (citations omitted). Here lies the glaring problem with Caner's motive. By his own admission, he wants to limit the public's access to his works, not market the works.

Applicable to Jonathan's fair use defense, in finding that the VTR company did not infringe on the network's copyrights, the Supreme Court held that the VTR users' unauthorized reproduction was fair use because it was not commercial and the networks could not demonstrate any likelihood of market harm. *Id.* at 449, 454. Rejecting Caner's only fair use argument (amount of work used), *Sony* held, "the fact that the entire work is reproduced, see § 107(3), does not have its ordinary effect of militating against a finding of fair use." *Id.* at 449-50.

In *Triangle Publications*, 626 F.2d at 1175, the Fifth Circuit found that courts generally focus on market harm over the other factors. The court found one of TV Guide's competitors

could reproduce TV Guide's cover in a comparative advertisement. *Id.* at 1175-78. The case directly refutes Caner's prior argument that Jonathan would have lost fair use protection if Caner could prove a commercial motive. *Id.* at 1175. The case also refutes Caner's speculation of market harm, holding that the Copyright Act does not concern itself with TV Guide's fear that its competitor would steal customers through persuasive advertisement. *Id.* at 1177-78. So too here, if Caner loses a speaking gig because Jonathan exposes his deceit to the public, the drafters of the Copyright Act will shed no tear.

Speaking of those drafters, Caner cites the House Report on the fair use statute, "Since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts." House Report, at 65, U.S. Code Cong. & Admin. News 1976, p. 5678, quoted in *Sony*, 464 U.S. at n.31. In reality, Jonathan wishes that Caner would have used some "reason" in the 120 days between filing this action and amending the Complaint. No person in Caner's shoes would have missed the fair use defense if he thought about this case for even 120 seconds.

In any event, Caner's reliance on the legislative history is misplaced. As *Sony* explains, the House was simply explaining why Congress did not wish to restrict the ability of courts to mold the fair use doctrine with foreseen and unforeseen advances in technology. *Id.* I cannot find any court case in the country that has cited this portion of the legislative history as supporting a reluctance to grant fees in fair use cases. In fact, I cannot even find a case where a plaintiff even made this argument.

**VI.      This Court should deter him (and people like him) from filing suits.**

Caner claims that he "had his 'day in court'" as if he deserved one. Fees will deter future Caners from bringing lawsuits to completely remove works from the public sphere and/or use a

10

threat of attorney fees to browbeat critics into submission.

As shown, courts show no reluctance to award fees in fair use cases. Fees make more sense in fair use cases because the defendant is litigating their First Amendment rights (as coextensive with the common law fair use doctrine and codified in the fair use statute). *Fogerty v. Fantasy*, 510 U.S. 517, 527 (1994); *Sofa Entm't. v. Dodger Prods.*, 709 F.3d 1273, 1280 (9th Cir. 2013); *Hofheinz*, 2003 U.S. Dist. LEXIS 16940, *18.

As Caner concedes, lawsuits like Caner's threaten to chill the creation of critical works. The Count 2 video highlights the danger. What if Jonathan was unrepresented and had to take a default judgment in Texas, a jurisdiction more than 1,000 miles from his home? Caner would have succeeded in removing a work with only minor use of his words that in no way could be described as anything other than a critical work. In fact, Caner *did* succeed because YouTube removed the video for Caner, and Jonathan did not repost the video (or any other video) out of fear of the litigation and of paying Caner's attorney fees.

This lawsuit has been repeatedly blogged about by Caner's critics, Caner's supporters, religious media, and others. Perhaps some or even most of Caner's critics are emboldened and resilient, but it is highly likely that others will fear posting videos like the Count 2 video. Fees will encourage Caner's critics and the critics of others.

Not only does Caner concede that fees encourage the creation of works discouraged by litigation like this, but he also concedes that fees encourage defendants to litigate fair use. By litigating fair use in this case, Jonathan has helped foster persuasive precedent on a key issue in the internet age: whether a public figure can assert copyright to hide their recorded words or actions. Caner does not distinguish the hypothetical examples in Jonathan's opening brief, such

11

as George Allen suing whoever posted the "macaca" video, Howard Dean suing over the primal scream video, or Rob Ford suing over basically any video of him. If such a public figure tried to do so now, the defendant would be able to cite to this Court's opinion as on all fours. This Court should reward Jonathan for pushing back when Caner sought to permanently silence him through the threats of attorney fees and defamation lawsuits.

## VII.      Courts routinely award fees to *pro bono* counsel.

Caner does not dispute the relevant market rates in Lynchburg, but Caner argues that the fees are not reasonable because I did not charge Jonathan for my services. But "the actual fee arrangement between the client and the attorney is immaterial." *Pinkham v. Camex, Inc.*, 84 F.3d 292, 294 (8th Cir. 1996) (copyright case). Awarding fees to *pro bono* counsel encourages *pro bono* representation in the hopes of recovering fees. *Cuellar v. Joyce*, 603 F.3d 1142, 1143 (9th Cir. 2010) (fee shifting provision under Hague Convention). On the other hand, denying fees to *pro bono* counsel discourages attorneys from representing indigent clients. *Id.*

A unanimous Supreme Court held in *Blum v. Stenson*, 465 U.S. 886, 892-896 (1984), that courts must award fees in civil rights cases based upon the prevailing market rate equally to *pro bono* attorneys and attorneys on hourly retainer with their clients. The Supreme Court later reiterated, "Should a fee agreement provide less than a reasonable fee calculated in this manner, the defendant should nevertheless be required to pay the higher amount." *Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989).

In affirming a defense fee award under the ADA, the Fourth Circuit explained, "But courts have consistently held that entities providing *pro bono* representation may receive attorney's fees where appropriate, even though they did not expect payment from the client and,

in some cases, received public funding." *Brinn v. Tidewater Transp. Dist. Comm'n*, 242 F.3d 227, 234-235 (4th Cir. 2001). *See also United Steelworkers v. Retirement Income Plan for Hourly-Rated Employees of ASARCO*, 512 F.3d 555, 564-565 (9th Cir. 2008) (reasonable rate not determined by rate actually charged).

Rejecting similar arguments to Caner's, one court explained:

> ASG cites no authority holding that a party is not entitled to an award of attorney's fees simply because the party is related to his or her lawyer. The Court does not believe that it matters whether McGowan was or was not obligated to pay Attorney Yablonski, as courts award attorney fees even to parties represented by pro bono counsel. …
>
> McGowan hired his step-father, which this Court finds reasonable particularly in light of McGowan's unemployment at the time and asserted lack of funds to hire an attorney to respond to ASG's lawsuit.

*Auto. Support Group, LLC v. Hightower*, 2012 U.S. Dist. LEXIS 1443, at *4, *13 ( E.D. Mich. Jan. 6, 2012) (fee shifting under state statute).

In the copyright context, the Fourth Circuit applies Supreme Court civil rights cases as to whether an attorney's fee request is "reasonable." *Bond*, 317 F.3d at 398-400 (reversing denial of defense fees to attorneys who represented their own law firm). Other courts have awarded fees to *pro bono* attorneys in copyright cases. *See Righthaven, LLC v. Leon*, 2011 U.S. Dist. LEXIS 72043, at *2-3 (D. Nev. July 5, 2011); *Blue Moon Media Group v. Field*, 2011 U.S. Dist. LEXIS 108066 at n.3 (E.D.N.Y. Apr. 11, 2011), *adopted by,* 2011 U.S. Dist. LEXIS 102263 (E.D.N.Y., Sept. 12, 2011) ("The Court finds that an award of attorneys' fees is appropriate under the Copyright Act despite the fact that Defendant was represented *pro bono*."). *See also Recouvreur v. Carreon*, 940 F. Supp. 2d 1063, 1070-1071 (N.D. Cal. 2013) (awarding prevailing market rate

to *pro bono* attorney in Lanham Act case).

Caner cites no legal authority at all for his proposition that a *pro bono* attorney should receive no or less compensation. In fact, Caner's argument flies in the face of the even-handed and party-neutral standard for copyright cases. What is the difference between a *pro bono* defense attorney who files for fees and a plaintiff's attorney who takes a case on a contingency fee and files for fees after a nominal award, declaratory relief, and/or injunctive relief for his client? "[I]f there is any difference between the two we must remember that it wasn't the defendant who chose to litigate." *Cohen v. Virginia Elec. & Power*, 617 F. Supp. 619, 623 (E.D. Va. 1985), *aff'd in part, appeal dismissed in part*, 788 F.2d 247 (4th Cir. 1986).

Caner also does not explain what alternative Jonathan had. Legal aid societies are not chomping at the bit to take up copyright defense cases, courts do not appoint attorneys for copyright defense, and Jonathan could not afford to pay for a lawyer. Caner does not dispute that both my current and prior firms agreed to let me represent my brother due to an expectation of fees or that my time on the case has caused a trade-off, with each hour preventing me from working on other work. This Court should award fees at full market rate and punish Caner—not my law firms—for Caner's decision to file a meritless suit.

**VIII.     The financial disparity supports a full fee award.**

Caner argues that he cannot afford to pay fees. But Caner's "allegations of poverty do not reduce the costs of this litigation that could have been avoided but for the unreasonable positions [he] has taken." *Silver Ring Splint v. Digisplint* 567 F. Supp. 2d 847, 858 (W.D. Va. 2008).

This Court should not credit his claim either. As he boasts when arguing potential market harm, he is a best-selling author in high demand for lectures around the country. He is a university

president, and his predecessor received $145,000 of income plus $25,521 in "other compensation" in 2012. *See* BP Form 990 p. 14, attached as Ex. I. He owns two houses, assessed at more than $550,000 combined, and lives at neither location as he resides in the "President's Home" at his university. *See* Property assessments, attached as Ex. J and K; BP map, attached as Ex. L.

In stark contrast, Jonathan was an unemployed husband and father of three at the time of filing and currently works part-time as an Adult Day Service Aid. Jon Autry Dec. ¶ 31 (Docket #28 Ex A); Josh Autry Dec. ¶8 (attached to Fee Petition as Ex. A). Suffice it to say that Jonathan Autry and Ergun Caner do not share an income bracket. Defense fees make more sense in this case than most fee-shifting scenarios. Normally, fee-shifting involves contexts where the plaintiff is the little guy. This Davis versus Goliath type of litigation led the Supreme Court to provide fees as a matter of course to prevailing civil rights plaintiffs. But here that public policy supports defense fees because Caner sued someone unable to afford counsel. *See Mattel*, 2004 U.S. Dist. LEXIS 12469, at*7 (finding fees appropriate in part because plaintiff-corporation sued individual artist).

Caner relies on *Randolph v. Dimension Films*, 634 F. Supp. 2d 779 (S.D. Tex. 2009).[6] Substantially reducing the lodestar, the court primarily relied on the simplicity of the litigation and the plaintiff-individual's "comparative financial weakness" to the defendant-corporation. *Id.* at 799-801. Dimension Films last year made a $58 million profit off of *Scary Movie 5* alone.[7] Last year, Jonathan was unemployed. This year, he works part time. Caner, on the other hand, is a university president with a six figure income who owns two houses worth more than half a million and lives rent-free in a "President's House."[8] Caner is no Randolph, and Jonathan is

---

[6] Caner mistakenly cites to the first Federal Supplement reporter.
[7] http://en.wikipedia.org/wiki/Dimension_Films.
[8] The court found a defense fee award proper because there was a clear dissimilarity between

certainly no Dimension Films.

**IX.      The only thing "ludicrous" about the amount of hours is Caner's continued attempts to drive up the costs of litigation.**

Caner argues that the amount of hours "ludicrous," noting that Jason Smathers, a Co-Defendant, had his own lawyer. But Caner chose to sue two people with no relation who lived on opposite sides of the country. He should have expected them to hire separate counsel—assuming they could obtain counsel, that is. In co-party situations, competent counsel for each party still has an ethical obligation to research the issues and to provide full representation. Even still, Smathers's lawyer and I did divvy up the motion work. Smathers's attorney was primarily responsible for drafting the motion to dismiss for failure to join the U.S.[9] I was primarily responsible for drafting the transfer motion, the motions to dismiss for lack of jurisdiction, and the motion for summary judgment. To the extent there was any duplication, that duplication was unavoidable in a co-party scenario. Neither one of us could ethically sign off on the other's work without at least some independent research and review.

Caner also argues that the hours must be too high because this case resolved before discovery, but Caner does not point this Court to a single billing entry as unnecessary. Nor does Caner deny that he made me brief three completely unneeded motions simply because of his baseless opposition: the transfer motion, the motion to dismiss for lack of jurisdiction, and the

---

plaintiff's work and the defendant's work even though the plaintiff did not act in bad faith. *Id.* at 794-95 & n.2.

[9] The U.S. is an indispensable party who not only created the alleged copyrighted works by recording the videos in the first instance, but turned them over to Smathers knowing Smathers's expressed intent to publish the videos. The U.S. is critical to the defense of license to publish videos as the U.S. knew that intention and presumably had authority to grant license to publish works it created. The U.S. is also key to whether Caner had any rights to the videos at all given statutory and regulatory exclusions for contractor works and government works. Discovery would likely have involved depositions of government employees and document requests related to Caner's contract and payment.

motion to stay discovery.[10]

Caner further concedes that I needed to research and brief the other issues in the motion for summary judgment because I did not know for certain that this Court would rule on fair use without discovery. These issues included standing to sue, fair use, license, waiver, damages, attorney fees, and an injunction.

Regarding my hours to "get acquainted," by requesting $250, a rate approved by this Court about seven years ago without seeking any adjustment for inflation, instead of seeking a much higher rate that a copyright specialist could charge, it all balances out. A general litigator should be able to charge reasonable a general litigation rate and accept a case with issues that the litigator has not previously dealt with. Jonathan did not have a great deal of selection in his counsel. He was not receiving *pro bono* offers by experienced copyright attorneys. As explained, an experienced copyright attorney would presumably do less research but would charge a much higher premium for his or her time.

As previously explained, I chose to save time by not re-doing my research after the transfer to the Fourth Circuit even though it likely would have aided this Court and by requesting argument by phone for both the motion to stay and the dispositive motion. The desire to stay discovery further evidences an intention to avoid unnecessary hours in depositions (with travel), written discovery, and possible discovery disputes. As to Caner's argument that my hours should be lower because Jonathan did not file an answer, there's no time recorded for such and I dare say that my brother's affidavit contains more factual discussion than any answer I've seen in

---

[10] At the time of Magistrate Ballou's ruling, it was not apparent that Caner's opposition to the motion to stay discovery was baseless, but Caner's actions since then have made this clear as he sought no discovery after receiving his requested permission to conduct written discovery and could not identify any needed discovery at oral argument on the dispositive motion.

federal court by a civil defendant. Finally, I do not seek any time before the Amended Complaint, which included settlement discussions and preliminary research.

Caner cites *Allora, LLC v. Cambridge Builders of Johnston County*, 532 Fed. Appx. 349 (4th Cir. 2013), as supporting a fee reduction, but fails to note that the plaintiff (the prevailing party) did not challenge the reduction on appeal. The unpublished panel decision purely considered the defendants' challenge to the fee award to plaintiff, which the Fourth Circuit rejected. Although the district court's summary judgment decision is publically available, *sub. nom. Donald A. Gardner Architects v. Cambridge Builders*, 803 F. Supp. 2d 373 (E.D.N.C. 2011), I have not been able to locate the fee decision on Lexis-Nexis. Accordingly, Caner's citation is not helpful to this Court because it is unclear why the lower court reduced the fee award.[11]

Caner next cites to *Quantum Sys. Integrators. v. Sprint Nextel*, 2009 U.S. Dist. LEXIS 98742 (E.D. Va. Oct. 16, 2009), as supporting a fee reduction. Caner fails to note *why* the plaintiff received only a 60% fee award, perhaps hoping court and counsel will not read his citations. In reality, the court found a large number of hours reasonable, but reduced the award due to the minimal jury verdict for the plaintiff. The court found that the plaintiff reasonably spent nearly 500 hours on the case through discovery, noting that "many of the discovery disputes that resulted in Quantum driving up its discovery hours in this case were caused by Sprint's actions." *Id.* at 12-14. The court further found that more than 1000 hours was reasonable for the time from close of discovery through trial. *Id.* at *14. However, the Court reduced fees by

---

[11] The Fourth Circuit found plaintiff fees appropriate because the defendant failed to consider settlement even after summary judgment was entered for the plaintiff, the defendant's contentions were "questionable," and the infringement was "egregious." *Id.* at 352.

18

40% because of the small amount of success:

> Quantum sought nearly $1.5 million in damages and received just over $69,000. Practically speaking, while Quantum technically qualifies as a prevailing party, the success it actually achieved in this lawsuit was minimal

*Id.* at *20.[12] Unlike in that case, Jonathan completely prevailed, and this Court should award full fees.

## X.    Conclusion

Jonathan requests this Honorable Court award him $34,389.59 for fees and costs.

Respectfully Submitted,

By:     /s/ Joshua M. Autry
Joshua M. Autry, Esquire
Pa. Supreme Ct. I.D. 208459
Lavery Faherty Patterson
225 Market St, Suite 304
Harrisburg, PA 17108
Phone: (717) 233-6633
Fax: (717) 233-7003
jautry@laverylaw.com

Dated: June 18, 2014

---

[12] The court found a fee award proper to the plaintiff where the defendant acted negligently and made incorrect factual assertions even though the court did not find that the defendant acted in bad faith or committed fraud. *Id.* at 6-8 n.4.

**CERTIFICATE OF SERVICE**

I hereby certify that on the date listed below I electronically filed the foregoing with the

Court using the CM/ECF system, which sent notification of such filing to the following person(s)

at the following email address(es):

> David C. Gibbs
> dgibbs@gibbsfirm.com

/s/ Joshua M. Autry_____

Joshua M. Autry, Esquire

Dated: June 18, 2014

20